THE STATE OF IOWA, Appellee, v. JOHN JUNKINS, Appellant.

**Murder:** MITIGATION OF DEATH PENALTY: EVIDENCE. On this prosecution for murder resulting in a judgment assessing the death penalty, the evidence is reviewed and held insufficient to show such defective mental and moral capacity of defendant as to justify mitigation of the judgment.

**Same:** MISCONDUCT IN ARGUMENT. Although the argument of counsel for the state that the death penalty ought to be imposed because in the event of life imprisonment there was a probability that defendant might be paroled or pardoned, while improper, was not ground for reversal in this case, because under the record there was no reasonable probability that the verdict would have been otherwise had the objection to the argument been sustained.

*Appeal from Appanoose District Court.*—HON. M. A. ROBERTS, Judge.

FRIDAY, JUNE 10, 1910.

THE defendant appeals from a conviction of murder in the first degree. So far as is necessary for an understanding of the case, the facts are stated in the opinion. *Affirmed.*

*Joseph C. Mitchell, Francis M. Hunter, John R. Price,* and *Clarence Baker,* for appellant.

*H. W. Byers, Attorney-General,* and *Chas. W. Lyon,* Assistant Attorney-General, for the State.

WEAVER, J.—In the early evening of February 5,

1909, Clara Rosen, a reputable young lady residing in the city of Ottumwa, left her home to call upon her sister, Mrs. Nelson, who lived a few blocks distant. Not arriving there, her friends became alarmed and entered upon a search, which resulted after a few hours in the discovery of her dead body not far from the Nelson home, in an old cellar or excavation upon a vacant lot from which a building had at some time been removed. Some brush had been thrown over the body, but it was not effectually concealed. That she had met a violent death was clearly apparent. The young woman's skull had been crushed, and there were indications that the fatal blow had been delivered with a heavy stone found in that vicinity. Her clothes were torn and when found her limbs were exposed. Whether the attack upon her had been made for the purpose of sexual crime is a matter of perhaps not conclusive inference, and for the purposes of the case, we may concede the contention of appellant's counsel that this aggravation of the offense is not clearly established. It is clear, however, that the assailant robbed the body of his victim of a diamond ring, bracelet, beads, purse, and other articles of more or less value. Circumstances which we need not pause to relate caused the appellant herein to be suspected of the crime, and he was later arrested and charged therewith. While in jail he signed a written confession of the robbery and murder. In talking with some of the witnesses, he claimed to have had a confederate who assisted in the commission of the crime. An indictment having been returned, counsel were assigned for the defense, and upon their application, the venue was changed to Appanoose county where the trial was had, resulting in a verdict of murder in the first degree and assessing the death penalty. Judgment was entered accordingly.

In submitting the appeal therefrom to this court, counsel concede the guilt of the accused and admit that his conviction of the crime is sustained by the overwhelming

weight  of  the  testimony.    Their  plea  for  interference

1. MURDER: miti-
gation of death
penalty:
evidence.

by  this  court  is  confined  to  the  punishment
assessed  by  the  jury,  which  we  are  asked  to
reduce  or  change  to  imprisonment  for  life.
The  argument,  presented  with  great  earnestness  and  force,
is  that  the  appellant  has  been  shown  to  be  a  degenerate
whose  defective  mental  and  moral  nature  renders  him  no
more  responsible  for  manifestations  of  criminal  violence,
than  is  a  member  of  the  brute  creation  having  neither  rea-
son  nor  capacity  to  understand  the  moral  quality  of  its
act.    To  take  the  life  of  such  a  person  in  vindication  of
law  and  order  is  said  to  be  an  idle  act,  for  it  cannot  oper-
ate  as  a  deterrent  to  others  of  his  class,  for  such  as  he  are
the  blind  slaves  of  their  abnormal  passions  and  criminal
tendencies,  and  when  these  are  aroused  to  activity  the  pos-
sibility  of  punishment,  however  severe  or  drastic,  will
not  serve  to  turn  them  from  their  evil  purpose.    If  a  man
who  has  led  an  honorable  and  lawabiding  life  becomes  in-
sane,  and  under  the  influence  of  a  diseased  mind,  com-
mits  an  atrocious  murder,  the  law  does  not  demand  his
life  in  punishment  but  contents  itself  with  putting  him  in
confinement,  by  which  to  restrain  him  from  other  acts  of
violence.    "If,  then,"  say  counsel,  "the  law  interposes  the
shield  of  its  protection  to  save  the  life  of  a  once  normal
person  who  has  become  insane,  why  should  we  not  be
equally  reluctant  to  pronounce  the  death  penalty  upon  one,
who,  by  reason  of  a  defective  organization,  moulded  by
pre-natal  limitations  and  conditions,  and  developed  in
vicious  environments  for  which  he  is  not  responsible,  is
also  incapable  of  appreciating  moral  or  social  obligations?"
Counsel  here  touch  upon  a  question  which  is  having  the
increasing  attention  of  students  of  criminology  and  kindred
topics,  and  it  may  be  true,  as  many  learned  investigators
think,  that  the  methods  which  now  prevail  of  protecting
society  against  its  defective  and  criminal  classes  are  so
unscientific  in  conception  and  so  ineffective  in  practice

that a civilized people should discard them for other and
saner schemes of retributive and preventive justice.    But,
as we have already suggested, the reform must come, if
at all, through the lawmaking power, and until then the
courts must administer the law as it is written.    So long
as the death penalty is retained for any offense, the pro-
vision of our statute which confides to the jury, and the
jury alone, the option of assessing it constitutes a reason-
ably effective safeguard against its indiscriminate applica-
tion.    It is the chief virtue and value of our jury system
that jurors are prone to look upon matters submitted to
their consideration in the light of the experience and ob-
servation of the average man, and make reasonable allow-
ance for human foibles and frailties, and, generally speak-
ing, it may be taken for granted that the extreme penalty
will not be pronounced except in the most marked and
flagrant cases.    True, there may be times of great popular
excitement when the all-pervading atmosphere of prejudice
and passion penetrates the inmost chambers of the temple
of justice, rendering a fair trial difficult if not impossible.
Ordinarily, however, it is within the power of the court,
by granting change of venue or by temporary postpone-
ment, to insure a trial in which the issues will be fairly
considered upon their merits.

In the case at bar the defendant was given a change
of venue to another county.    Nearly four months inter-
vened before he was brought to trial.    He was defended
by distinguished, able, and experienced lawyers who have
served him with unselfish zeal, and while not stultifying
themselves by denying his guilt or asking for his acquittal,
have presented every mitigating fact and circumstance in
its most persuasive and forcible aspect.    There is nothing
to indicate that the trial was had under pressure imposed
by outside influences, and we are bound to believe that the
twelve jurors to whom the appellant's fate was committed
reached the conscientious conclusion that, however defective

he may be in the attributes which make up a normal human being, he is not so lacking in capacity to distinguish between right and wrong, or in power to resist the leadings of criminal impulse as to justify a mitigation of the punishment which would justly be imposed upon him, were he the equal of the average man in respect to those qualities. Assuming the correctness of this conclusion, it must be said that if punishment by death may ever be justified, no more flagrant case calling for its infliction was ever tried than is presented by the record before us. We have not gone, nor shall we in this opinion, go minutely into the horrifying details of the appellant's offense. It is enough to say that in all the history of crime none more inexcusable was ever committed. It was murder, brutal, cruel, hideous, and cowardly in the extreme, and assuming the appellant's moral and legal responsibility, the assessment of anything less than the highest punishment provided by law, would be a startling failure of justice.

Nor does the evidence make such a showing of appellant's defective mental and moral capacity as to permit this court to interfere with the verdict. He had received some degree of education and was able to read and write. He appears to have known how to perform acceptable manual labor when disposed to do it. While a slave to drink and drugs, his faculties were not so obscured on the evening of his awful crime but that he remembered and related the circumstances attending it, and the disposition made by him of the booty taken from the body of his victim. It may be, as counsel suggest, that he is the natural and inevitable product of "Smoky Row" and the slums of the city, and that in a certain just sense the ultimate responsibility for turning out such as he to prey upon the innocent and helpless rests upon society or the state which permits, if not legalizes, the conditions which alone make such criminals possible, but the development of the ideal state in which crime shall be banished or destroyed by

eliminating the causes which produce it is yet beyond our reach. As now constituted, the law ordinarily observes only the overt criminal act of the rational individual and punishes it without attempting to trace the criminal impulse or inclination to its origin. People are born and reared under circumstances varying from wealth, comfort, and wholesome examples and influences on the one hand to poverty, misery, and surroundings of the most unfavorable and corrupting character on the other, but all are made subject to the same law, and each must render to it the same measure of obedience. This is so because such are our human limitations that a finer discrimination and a juster apportionment of responsibility is apparently impossible, until we have reached a higher plane of civilization than has yet been achieved. The appellant has been fairly tried under the law as it exists, and we find nothing in the general merits of the case as disclosed by the record which authorizes us to disturb the verdict or judgment.

While several errors are assigned, the only one argued other than as pertains to the measure of punishment has reference to the alleged misconduct of the prosecuting attorney in argument to the jury. The language objected to was in effect that the death penalty ought to be inflicted because in the event of life imprisonment there was a possibility that appellant might in time be pardoned or paroled. The argument was one which would better have been omitted, and we can conceive of circumstances under which, especially where the case involves other doubtful features, we would be disposed to hold it prejudicial error for the trial court to permit it, but we are united in the view that under the record here presented there is no reasonable probability that the verdict would have been otherwise, had the appellant's objection to the argument been sustained.

*2. SAME: misconduct in argument.*

No ground has been shown for reversal or for any mitigation or change in the sentence imposed upon the

defendant, and the judgment of the district court is therefore *affirmed*.