[No. 23623.   Department Two.   January 29, 1932.]

THE STATE OF WASHINGTON, *Respondent*, v. HAROLD CARPENTER *et al.*, *Appellants.*[1]

[1]Reported in 7 P. (2d) 573.

*Frank P. Christensen, Harry L. Parr,* and *John S. Lynch,* for appellants.

*Harold P. Troy, Wesley Lloyd,* and *James P. Neal,* for respondent.

·MILLARD, J.—Harold Carpenter, Walter Dubuc and Ethel Willis, were, by information, jointly charged with the crime of murder in the first degree, in that, while they were engaged July 11, 1931, in committing robbery, two of the defendants struck the blows which effected the death of their victim.

Dubuc and Willis pleaded not guilty on the ground of mental irresponsibility at the time of the commission of the crime charged. They further pleaded that, at the time of their trial, they had become mentally responsible. Carpenter pleaded not guilty by reason of mental irresponsibility at the time of the killing and at the time of his trial.

Trial to a jury resulted in verdicts finding the three defendants guilty of murder in the first degree, and that the death penalty shall be inflicted upon Carpenter and Dubuc; but that the death penalty shall not be inflicted upon Willis. Judgment was entered that Carpenter and Dubuc shall suffer the death penalty and that Willis shall be imprisoned for life. The defendants appealed.

The facts are summarized as follows: On or about July 7, 1931, while in Yakima, Carpenter and Dubuc entered into a conspiracy to rob Peter Jacobson, a widower eighty-six years of age who resided on Chambers prairie, in Thurston county. Ethel Willis lived with Carpenter as his leman from the middle of May, 1931, until the three appellants were arrested in Yakima on the charge of murdering Jacobson. The three appellants were living together in Yakima, having gone there from Olympia, at the time the two men entered into the conspiracy. Dubuc confessed that he and Carpenter agreed that,

". . . in case we had to kill the old man while robbing him, we would throw him in the house, and burn the house down, and no one would then know who committed the crime, or that a crime had been committed."

Ethel Willis confessed that her two companions entered into a conspiracy to rob Jacobson, but denied that they expressed in her presence any intention of killing their victim; however, in her confession she stated the two men planned that, if it became necessary to kill Jacobson, the body would be placed in the victim's house which would be burned to conceal the crime. She confessed as follows:

"Walter and Bill (Dubuc and Carpenter) had discussed robbing the old man Jacobson several days prior to the murder. They had planned in my presence to knock the old man out in order to rob him, but did not intend to kill him. . . . It was previously planned, that is, just before the robbery, that, in case they should kill the old man, they would put the old man in the house and set the house on fire, so that nobody could tell what had happened, or who had done it."

Traveling together in an automobile, the three appellants departed from Yakima Tuesday, July 7th,

arriving at Hawks prairie, near Olympia, July 9th. They camped at that point until the night of July 11th. Pursuant to their plan, the three appellants (Dubuc driving) rode in their automobile to Jacobson's house on Chambers prairie. When Jacobson answered the knock upon his door, Dubuc inquired "where Mr. Jacobson lives." As prearranged and for the purpose of getting the old man out of the house, Jacobson was then informed by Dubuc that Mr. Jacobson's daughter was ill. The old man then prepared to dress for the purpose of visiting his sick daughter. The killing was described by Dubuc as follows:

"I stayed at the door while the old man dressed, and after he was dressed I went on out to the car, and he went to the gate to open it and found the gate open, and then came back to the side of the car, where I struck him several times with my fist, knocking him down about 15 or 20 feet from the car. I got a-straddle of Mr. Jacobson and about that time Carpenter came up and struck him over the head with some piece of iron, which I later learned from Carpenter was the .22 rifle which I identify as the same rifle that the sheriff has shown me and has now in his possession."

Ethel Willis sat in the automobile watching, while her two companions slew Jacobson. When Carpenter took over the task of killing Jacobson, Dubuc got into the automobile with Willis and drove back to their camp, packed up their equipment and returned to the scene of the crime to pick up Carpenter. The three then drove to Yakima with their ill-gotten gains—two dollars in cash, a pocket knife and a watch—and were there arrested a few weeks later, returned to Olympia for trial, and convicted, as stated above.

There is no merit in the contention of appellants that the information does not state facts sufficient to constitute the crime of murder in the first de-

gree. The information alleged that, while the three appellants were engaged in

". . . committing, attempting to commit, and withdrawing from the scene of the commission of a felony, to-wit: robbery of one Peter Jacobson,"

the appellants Carpenter and Dubuc killed—the manner in which the murder was effected is recited in detail—Jacobson; and that Carpenter, Dubuc and Willis

". . . wilfully, unlawfully and feloniously did aid, encourage, propose, assist, advise, counsel and abet each other in the unlawful commission of said crime."

The information charges the crime in the language of the statute:

"The killing of a human being . . . is murder in the first degree when committed . . . by a person engaged in the commission of, or in attempting to commit, or in withdrawing from the scene of, a robbery . . ." Rem. Comp. Stat., § 2392.

One aiding and abetting another in the commission of a felony is a principal, and shall be proceeded against and punished as a principal.

"Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be proceeded against and punished as such." Rem. Comp. Stat., § 2260.

The acts (aiding and abetting each other in committing the felony of robbery and killing a human being while thus employed) charged as a crime are clearly set forth in the information, not only in such a manner as to enable a person of common understanding

to know what is intended, but in the very words of the statute defining and describing such offense. There was a compliance with the statutory provision (Rem. Comp. Stat., § 2065) as to the requisites of an information.

■ Counsel for appellant Carpenter complains of instruction No. 29 given by the court to the jury. It is argued that as to Carpenter, who confessed and threw himself upon the mercy of the jury, the instruction was highly prejudicial, as it took away from the jury the question of what punishment shall be inflicted upon a defendant convicted of murder in the first degree.

The statute (Rem. Comp. Stat., § 2392) provides that the jury shall find whether, upon conviction of murder in the first degree, the defendant's punishment shall be death or life imprisonment. The jury is first required to find whether the defendant is guilty. If the jury find the defendant guilty, the jury is then required to find a special verdict as to whether or not the death penalty shall be inflicted; ''and if such special verdict is in the affirmative, the penalty shall be death (Rem. Comp. Stat., § 2392),'' otherwise, it shall be life imprisonment.

Instruction No. 29 reads as follows:

*''Except as you are hereinafter instructed with reference to the special verdict which will be submitted to you,* the jury has nothing to do with the questions of punishment that the law provides shall be imposed upon a person convicted of crime, except that the fact that punishment may be imposed may be considered by you for the purpose and to the extent of inducing the jury to be careful, and in arriving at your verdict you should free your minds from passion, prejudice and sympathy for or against defendants or any one, remembering that it is your duty and province to determine the question of fact as to whether or not the

484

defendants or either of them are guilty of the crime charged, under all the evidence and in the light of all the law as given you by the court.''

The italicized portion of the foregoing instruction specifically refers to qualifying succeeding instructions. Instruction No. 33, reading as follows, supplements and qualifies instruction No. 29, and directs the attention of the jury to the exception in homicide cases as to the general rule of the jury's province in assessing the penalty:

''If you find any defendant or defendants guilty of murder in the first degree you will, in a special form of verdict submitted to you write in the names of such defendant or defendants against whom you find the death penalty shall be inflicted and the name or names of such defendant or defendants against whom you find the death penalty shall not be inflicted.''

The jury returned verdicts of guilty, as to all three appellants, of the crime charged. It is patent that the instructions did not mislead the jury, in view of the further finding by special verdicts that the death penalty shall be inflicted upon Carpenter and Dubuc, but that the death penalty shall not be inflicted upon Willis. Such affirmative acts manifest a clear understanding by the jury of their province.

It is urged on behalf of appellant Dubuc that the court erred in refusing to give the following requested instruction:

''If you find from the evidence that the mind of defendant Walter Dubuc at the time of the alleged murder of Peter Jacobson was temporarily diseased, and that, by reason of such disease, his will power was then impaired, and that, by reason of such impairment so caused, he did not have sufficient will power to refrain from committing the act, then it would be your duty to find him not guilty.''

On behalf of appellant Willis, it is argued that the court erred in failing to instruct as to the question of mental irresponsibility and psychosis.

Dubue pleaded not guilty on the ground

". . . that he was mentally irresponsible by reason of temporary insanity at the time of the alleged commission of the alleged crime."

Willis pleaded

". . . that she was mentally irresponsible by reason of psychosis at the time of the alleged commission of the alleged crime."

In each case, the plea was one of mental affection or derangement, by reason of which the accused was not responsible for his or her acts. The defense of each was, in fact, temporary insanity. The test in such cases is whether the accused had sufficient capacity at the time to distinguish between right and wrong with reference to the act charged.

"Confusion has resulted from the failure of some courts to distinguish between partial insanity in the sense of weakened or disordered intellect generally, and partial insanity in the sense of monomania. While the subjects of inquiry suggested by the instruction given afford an inviting field for the talent and theory of the alienist, so far as the law is concerned the test is a simple one, and is sustained by authority without number. 'Had the accused sufficient capacity at the time of committing the act to distinguish between right and wrong with reference to the act complained of?' is the general rule adopted by the courts." *State v. Craig,* 52 Wash. 66, 100 Pac. 167.

The court charged the jury as follows, from which it clearly appears that the jury were properly instructed regarding the defenses of temporary insanity and mental irresponsibility:

"Regarding the plea of 'not guilty' by reason of insanity, which has been filed by the defendants and each

of them, in this case, you are advised that the defense of insanity if established and proven is admissible and good under the laws of this state, but it must be shown by the defendants by a fair preponderance of the evidence that the mental condition of the defendants at and just prior to the date of the acts or things charged in the information was such that he could not distinguish between right and wrong as to such acts or things charged, the true test of insanity or lack of it being the mental capacity and ability or lack of it to understand the difference between right and wrong and to act accordingly with reference to the subject matter involved. . . . When evidence is introduced upon that question, then the question of whether or not the defendant is responsible for his acts becomes a question for you to determine from all the evidence bearing upon it; and if, after carefully considering all of such evidence, there should remain any reasonable doubt as to whether or not they were responsible, then your verdict should be 'Not guilty because of insanity or mental irresponsibility.' ''

It is next insisted that the evidence is insufficient to sustain the verdict as to appellant Willis. The crime was planned in the presence of Willis in Yakima by Carpenter and Dubuc. Willis confessed that the two men had planned in her presence ''to knock the old man out in order to rob him,'' and that,

''. . . just before the robbery, in case they should kill the old man, they would put the old man in the house and set the house on fire, so that nobody could tell what had happened, or who had done it.''

She accompanied the two men, with whom she lived in Yakima, to Hawks prairie, there to await an opportune time to rob Jacobson and to kill him if he resisted. She rode in the automobile from Hawks prairie to Chambers prairie, thence to the home of Jacobson, with knowledge of the mission of her two men friends, with whom, it is a fair inference, she anticipated shar-

ing the fruits of the crime. She raised not her voice in protest against the planned robbery, nor did she object to their expressed purpose to kill the old man and to burn his body if it became necessary.

The gate was left ajar at the Jacobson house so that the three could make their getaway. She coolly sat in the automobile watching Carpenter and Dubuc kill Jacobson. She was, the jury were justified in finding, a lookout to give the alarm so as to facilitate the escape of the two murderers if any one appeared to interrupt them. By her acts, the jury were warranted in finding Willis aided and abetted the perpetration of the offense, hence she is as guilty as her two co-conspirators who struck the fatal blows.

A careful examination of the record not disclosing reversible error, the judgment is affirmed.

TOLMAN, C. J., BEALS, MAIN, and HOLCOMB, JJ., concur.