[Nos. 40034, 40036, 40091.    En Banc.    September 17, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. EDDIE WAYNE TODD *et al., Appellants.*\*

*Reported in 474 P.2d 542.

*Kempton, Savage & Gossard,* by *Anthony Savage, Jr.,* for appellant Todd (appointed counsel for appeal).

*Wm. J. Gaffney* and *Maurice Kadish,* for appellant Wood (appointed counsel for appeal).

*Charles M. Stokes* and *Ronald J. Meltzer,* for appellant Stewart (appointed counsel for appeal).

*Charles O. Carroll* and *Robert E. Dixon,* for respondent.

ROSELLINI, J.—The appellants Todd and Stewart were charged as principals and the appellant Wood as an aider and abetter in the crime of murder in the first degree. All were found guilty.

None of the appellants questions the sufficiency of the evidence to support the convictions. That evidence tended to show that the appellants met at a party in Seattle's central area on the evening of May 28, 1967; that during the course of the evening the appellant Wood loaned his car and his gun to the other two appellants for the purpose of committing a robbery; that the appellants Todd and Stewart did in fact participate together in the robbery of a Seattle Transit bus being operated by one Harry Lee Wren,

Jr., and that, during the commission of this robbery, Harry Lee Wren, Jr., was slain. Todd and Stewart returned to the party and thereafter, together with appellant Wood, disposed of the stolen property.

The appellants and another man went to Portland, Oregon, and participated in another robbery the following afternoon. As a result of the description of this offense being broadcast on police radios, the appellants were apprehended a few minutes later. In their possession was found not only the goods which were stolen in the Portland robbery but also the gun which, according to a firearms identification expert's testimony, fired the shot which killed Harry Lee Wren, Jr.; also there were found women's stockings which the appellants Todd and Stewart had borrowed at the party to use as masks in the Seattle robbery and which had been cut and tied with the apparent object of using them as masks.

The evidence against the appellants was supplied in large part by other guests at the party, to two of whom the appellant Todd stated that he had had to "blast" the driver of the bus because he would not open the door of the bus and let him get off. One of these witnesses, the girl friend of Todd, later led police to the spot where the coin changer taken from the bus had been thrown by appellant Stewart, while the witness was riding in the car with the appellants after the robbery.

The three appellants were charged jointly and they were tried together. Their separate appeals to this court were consolidated for hearing. All three appellants have urged one assignment of error relating to the admission of certain evidence, and the appellants Stewart and Wood have both urged that their motions for severance should have been granted. Each of the remaining assignments of error has been advanced by one of the appellants. We will discuss the contention concerning the admissibility of evidence alleged to have been discovered in an unlawful search first, the contentions of the appellants Stewart and Wood concerning severance second, the separate contentions of the appellants Stewart and Wood next, and finally we will consider the

only contention having merit, that of the appellant Todd concerning an allegedly erroneous instruction.

The contention that certain evidence (namely the gun which was used to kill Harry Lee Wren, Jr., and ammunition for it, and two women's stockings which were supposedly used as masks in the robbery) was erroneously admitted is grounded on the theory that Deputy Sheriff Hancock, who stopped the appellants' automobile in Portland, had no legitimate reason to stop it because, they say, they were driving in a lawful manner at the time they were stopped, and the officer did not have probable cause to believe that they had committed or were about to commit a felony.

In order to be justified in arresting without a warrant, an officer must believe and must have good reason to believe that a person has committed or is about to commit or is in the act of committing a felony. Not only must the officer have a real belief that the person is guilty, but that belief must be based upon reasonable grounds. Proper cause for arrest has often been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. *State v. Palmer,* 73 Wn.2d 462, 438 P.2d 876 (1968); *State v. Easton,* 69 Wn.2d 965, 422 P.2d 7 (1966); *State v. Miller,* 151 Wash. 114, 275 P. 75 (1929).

The trial judge in this case concluded that Deputy Sheriff Hancock had reasonable and probable cause to arrest the appellants. He based his conclusion upon the following facts which he found upon the evidence and which are supported by it: Multnomah County Deputy Sheriff Hancock had received a radio message that a robbery had been committed at a grocery store between 52nd and 53rd Streets on Halsey Street in the city of Portland. The suspects were described as being three Negroes of slight build, and as having departed the scene in an automobile. Deputy Sheriff Hancock knew that Halsey Street was a logical eastbound thoroughfare for departure from the city of Portland and assumed a position of surveillance near Halsey and 92nd. At approximately the time which he calcu-

lated a vehicle coming from 52nd would be passing the point where he was stationed, the appellants were observed in an automobile proceeding east along Halsey Street.

While the automobile did not conform to the description given over the radio, there were three Negro men of slight build visible in the car; and the officer stopped the car, believing that the three were the people who had committed the robbery. He explained that he noted the car did not conform to the description but supposed the car had either been misdescribed or had been exchanged for another car after the robbers left the scene of the robbery.

The appellants say that Deputy Sheriff Hancock would have stopped any vehicle with three Negro men in it which might have been passing at that time, even though the occupants were entirely innocent. This proposition is not justified by the evidence in this case. The fleeing felons were described not only as Negroes but also as slender or slight of build and the appellants fitted that description. The officer was justified in believing that the appellants were the persons who committed the robbery.

If the robbers had been described as three white men of slight build, and three white men of that description had driven past the same spot at the same time and proceeding in the same direction, the officer would have had probable cause to arrest them. Of course, if only one man had been involved, the description would have been inadequate to justify an arrest, since it would not be unusual for more than one person of that description to drive past a given point within a short period of time. But it would have been coincidental indeed if another vehicle bearing three men of the same description had passed that point at that particular time, headed in the same direction. Deputy Sheriff Hancock's experience had taught him that escape vehicles are sometimes misdescribed because only a fleeting glimpse is caught of them. It had also taught him that fleeing felons often change vehicles. Therefore, it was not unreasonable for him to discount the fact that the vehicle did not fit the description broadcast over his car radio.

The appellants make much of the fact that there were four men in the vehicle, rather than three, but the evidence showed that one of them was lying on the back seat of the car and was not visible to the officer. Apparently he was not observed at the scene of the crime, since the participants were described as three, rather than four men.

In *State v. Young,* 39 Wn.2d 910, 917-18, 239 P.2d 858 (1952), we said:

It is the duty of courts to protect citizens from unwarranted, arbitrary, illegal arrests by officers of the law. But we should not permit our zeal for protection of constitutional rights to blind us to our responsibility to other citizens who have the right to be protected from those who violate the law. In these days of modern transportation, when robbers have fast "get-away" cars, police must also have fast cars. Those fast cars must be equipped with radios, in order that law violators may be apprehended before they can make their escape, provided of course, that the officers have reasonable grounds to believe that the persons whom they arrest have committed the felony complained of.

And in *State v. Poe,* 74 Wn.2d 425, 445 P.2d 196 (1968), we observed that the probable cause for arrest should be examined in the light of the arresting officer's special experience, and that the standard should be, not what might appear to be probable cause to a passerby, but what would be probable cause to a reasonable, cautious, and prudent officer.

Here the officer anticipated that the escaping felons would choose the route on which he stationed his vehicle; at a time when an automobile coming from the scene of the crime could be expected to reach the place where the officer was stationed, the appellants, whose physical appearance matched the description given over the police radio, drove past headed away from the scene of the crime. He noted that the car did not match the description, but did not consider this significant in the light of his knowledge and experience. He had only a moment to make a judgment, but the judgment which he made was sound.

We conclude that there was probable cause for arrest.

Consequently, the fruit of the search made incident to that arrest was admissible.

In assigning error to the court's denial of their motions for separate trials, the appellants Stewart and Wood concede that the granting of such a motion rests within the sound discretion of the trial court. However, they call the court's attention to the case of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), wherein the United States Supreme Court held that, in a joint trial, admission of a codefendant's confession implicating the defendant violated his right of cross-examination of the witnesses against him because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining the petitioner's guilt. They suggest that the corollary of the rule laid down in that case (that such a confession is not admissible in a joint trial) is that it is an abuse of discretion to deny a motion for severance in any case where statements of one defendant incriminating another may be possibly *offered* in evidence at the trial.

We say that this is the suggested corollary because it is not so stated in the brief; but there is no contention that any such statements were in fact offered in this trial. As a matter of fact, there were no extrajudicial confessions implicating either of these appellants. It is true that Todd had made statements to friends shortly after the crime was committed; these implicated only himself. Each appellant denied his guilt to investigating officers and to the court, both before and during the trial. Statements made by each to the police may have implicated the others in his alibi, but not in the crime.

In *State v. Aiken*, 75 Wn.2d 421, 452 P.2d 232 (1969), we held that the case of *Bruton v. United States, supra,* did not stand for the proposition that, where both defendants have confessed and each confession has implicated the other, and where there is other circumstantial evidence tending to prove the guilt of the defendants beyond a reasonable doubt, separate trials must nevertheless be granted. As we observed, in *Bruton* the United States Supreme Court was

confronted with a case where one of the codefendants had made a confession and the other had not, where the confession implicated the nonconfessing defendant and was the only substantial evidence against him, and where the conviction of the confessor was itself set aside on appeal because his confession was involuntary.

That situation bears no resemblance to the situation presented to the trial court in this case. Here the prosecutor revealed that he had no confessions to offer in evidence and furthermore pointed out to the court that if, during the course of the trial, he should offer any extrajudicial statements of any defendant which might be prejudicial to another defendant, the court could exclude it. Apparently in the course of the trial, the only statement offered which was conceivably inadmissible against either Stewart or Wood was a statement attributed to Wood, made at the party, that he had lent his car to Todd and Stewart. The court instructed the jury that it should consider this as evidence only against the appellant Wood. It has not been argued by the prosecution that the court was in error in so limiting the probative value of this evidence, so we do not consider that question. Suffice it to say that the statement was not a confession, and standing alone it proved little as to the guilt of Stewart. It may have been corroborative, but the guilt of Stewart and Todd was shown by other independent and convincing evidence. Whether or not the court's instruction to consider the evidence only as evidence against Wood was understood and followed by the jury, the significance of the evidence was so slight that, when viewed in the light of all the other evidence, the appellant Stewart could not have been prejudiced by it.

We conclude that the rule of the *Bruton* case did not require the trial court to grant the appellants' motions for separate trials.

Some additional argument is made that the appellants' defenses were incompatible, but it is not shown wherein that alleged incompatibility lay. All of the appellants denied any involvement in the crime; none tried to implicate the others. This contention is without substance.

We find no abuse of discretion on the part of the trial court in denying the motion for severance.

Turning now to the separate contentions of the appellants, we consider first those of the appellant Stewart. He assigns error to the court's refusal of his requested instruction pertaining to his defense of alibi. This instruction stated that, if a person is charged with having been present and having participated in the commission of a crime and if in fact he was not present, his absence is a complete defense called "alibi." It further stated that Stewart had introduced evidence tending to prove that he was not present at the murder and that, if the jury entertained a reasonable doubt whether or not he was present, it should acquit him.

■ The trial court correctly refused this proposed instruction. While the appellant Stewart was charged as a principal, the prosecution was entitled to ask for a verdict of guilty even though the evidence showed only that he had aided and abetted the commission of the crime. *State v. Olson*, 50 Wn.2d 640, 314 P.2d 465 (1957); *State v. Cooper*, 26 Wn.2d 405, 174 P.2d 545 (1946). The trial court instructed the jury:

No. 10

Under the statutes of the State of Washington every person who stands by aiding, assisting, or abetting, or who, not being present, directly or indirectly, has aided, assisted, abetted, advised, encouraged, or counseled the perpetration of a crime is guilty of the commission of the crime and shall be proceeded against and punished as a principal.

The words "aid and abet" comprehend all assistance rendered by words, acts, encouragement, support of presence, actual or constructive, to render assistance should it become necessary.

No exception was taken to this instruction by the appellant Stewart. Under its language, the jury was entitled to find that the appellant was guilty even though he was not present at the time of the actual shooting. The requested instruction concerning "alibi" was contrary to the law applicable to the case. The jury might well have found that the state had failed to prove that the appellant boarded the

bus with the appellant Todd, and still have found that he aided and abetted him in the commission of the crime. The instruction advised to the contrary and was therefore improper.

■ The remaining contention of the appellant Stewart is that the court erred in refusing to dismiss the case against him because he was not given a preliminary hearing. The same contention was considered by this court in *State v. Kanistanaux,* 68 Wn.2d 652, 414 P.2d 784 (1966), wherein we held that a defendant has no right to such a hearing, and that the prosecutor may elect to charge a defendant directly in superior court, bypassing the preliminary hearing in justice court. That decision was reaffirmed by *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968). The appellant has shown no reason why that decision was erroneous nor has he made any showing that he was in any way prejudiced by the lack of such a hearing. This contention is likewise without merit.

The appellant Wood assigns error to the admission of evidence that the appellant Todd held a pistol in his hand on the night of his arrest in Portland, Oregon, claiming that it was evidence of another unrelated crime and prejudicial to the appellant Wood, since Wood was with appellant Todd in Portland.

■ Assuming that the appellant is correct that this evidence tended to prove the commission of another crime, it was nevertheless clearly relevant in connecting Todd with the crime charged, the gun having been shown to have been the one which was used in the Seattle murder of Harry Lee Wren, Jr. Relevant evidence is not inadmissible simply because it tends to prove another offense. *State v. Mott,* 74 Wn.2d 804, 447 P.2d 85 (1968).

The other separate contention of Wood is that the trial court committed error in permitting the prosecution to question him on cross-examination about seeing the gun, the stockings, and the other items in the car in Portland. The respondent points out that the appellant Wood voluntarily took the stand and on direct examination testified that, contrary to the testimony of witnesses who had said

he had brought the gun to the party on the night of the killing and had given it to Todd and Stewart to use in the commission of a robbery, he had not brought the gun to the party. The questions regarding his seeing the gun in the car in which he was riding in Portland were designed to test the credibility of this statement. (*See State v. Robideau,* 70 Wn.2d 994, 425 P.2d 880 (1967).) But even assuming that some of the questions asked exceeded the scope of the direct examination, the appellant has failed to point out how he was prejudiced by the asking and the answering of these questions.

█ The fact that a gun belonging to the appellant Wood, ammunition, and women's cut-off stockings were found in the car in which the appellant Wood was arrested in Portland had been placed before the jury in other competent testimony. The jury was entitled to weigh this evidence and the additional evidence before it that the gun was the weapon used in the murder, against Wood's statement that he did not take the gun to the party. The appellant Wood has not drawn our attention to any fact brought out on cross-examination which was not already before the jury. The admission of evidence which is merely cumulative is not prejudicial error. *State v. Swanson,* 73 Wn.2d 698, 440 P.2d 492 (1968).

Having disposed of those contentions which we have found to be without merit, we reach a question raised by the appellant Todd which concerns only the sentence of death imposed upon him by the verdict of the jury. The appellants Stewart and Wood were spared the death penalty and, consequently, the instruction complained of by the appellant Todd had no adverse effect upon the jury's verdict against them.

The appellant Todd took exception to the giving of the following instruction:

### No. 12

In the event you find a defendant guilty of the crime of murder in the first degree, and you do not direct the imposition of the death penalty, the court must then sentence the defendant to imprisonment for life.

Under the laws of this state, any person, including a person sentenced to imprisonment for life, is eligible to be paroled. Any prisoner on any life sentence will have a minimum sentence set for him by the Board of Prison Terms and Paroles. This minimum sentence cannot be reviewed or revised by any court unless the Board of Prison Terms and Paroles acts beyond their authority.

On a sentence of life imprisonment, the Board of Prison Terms and Paroles must set a minimum sentence of at least twenty years, and may set the minimum in any amount of time in excess of twenty years as in their discretion and judgment they deem proper.

Any prisoner may earn credit for time off their minimum sentence for good behavior. This credit may be as much as one third of their minimum sentence. Therefore, it is possible for a person serving a life sentence for murder in the first degree to be eligible for parole in thirteen and two-thirds years.

The trial court refused to omit the instruction, being of the opinion that it was authorized by language contained in the case of *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957). The trial court also took notice of the fact that counsel for the appellants had asked prospective jurors on voir dire, "Could you vote for life imprisonment as opposed to the death penalty?"

It is the position of the appellant Todd that this court has never actually approved the giving of an instruction like instruction No. 12, that it is misleading, and that it permits the prosecutor to argue to the jury that, if it does not impose the death penalty, the accused may well be on the streets again in 13½ years, when in fact it is extremely improbable that the appellant in this case would be paroled in such a short period of time. Furthermore, he argues, the instruction permits the jury to speculate upon matters which it is not within its province to consider and which have been assigned by the legislature to the exclusive jurisdiction of the parole board.

The respondent answers that the appellant Todd has opened up the question for speculation on the part of the jury by asking the jurors on voir dire whether or not they could "vote for life imprisonment." While arguing that the

appellant has planted in their minds the idea that "life imprisonment" means imprisonment without parole, he also argues on the other hand that the instruction is beneficial to the appellant because without it the jurors would speculate that a man condemned to life imprisonment could be released in 1 year.

■ Contrary to the understanding of the trial court and of the respondent, this court did not approve the giving of such an instruction in *State v. Collins, supra*. In that case, the trial court instructed the jury that, if it found the defendant guilty of murder in the first degree, it should determine further whether the death penalty should be imposed. The defendant urged on appeal that the trial court should have instructed the jury that, if it did not impose the death penalty, a life sentence was mandatory.

We held that the trial court did not err in refusing to give this instruction and remarked that such an instruction without an explanation of the powers and functions of the parole board would be misleading. This, of course, was one reason why the requested instruction was properly refused, but we did not intend to suggest that the giving of an instruction which outlined those powers and functions, over the objection of the defendant, would be proper.

The statute providing for the imposition of the death penalty, RCW 9.48.030, in pertinent part, reads as follows:

> [I]n every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided.

The statute thus provides that the jury shall decide "whether or not the death penalty shall be inflicted." It does not provide that the jury shall choose *between* penalties, but only that it shall decide whether to take the defendant's life or spare it. This may seem, at first glance, rather a nice point; but when it is considered that the alternative is not in fact a single possibility but as many possibilities as there are years left in the defendant's life,

that the determination of the duration of the sentence is placed ultimately in the hands of the parole board, that one of the aims of punishment is rehabilitation and that rehabilitation is not thought hopeless, it is not so unreasonable to suppose that the legislature did indeed intend the jury to decide the one stark question, shall this man's life be spared? unaided by any basis of speculation as to what his future might hold if it should decide in favor of mercy.

It must be remembered that, in all other prosecutions, the jury is told that punishment is none of its concern, that its sole function is to decide the defendant's guilt or innocence. Punishment is a question of legislative policy; the jury's function is to find the facts.

But when it comes to the imposition of the death penalty, the legislature has seen fit to make that question hinge upon a further fact to be found by the jury—how deeply has the defendant offended the community? As we have recognized in *State v. Smith,* 74 Wn.2d 744, 774, 446 P.2d 571 (1968), the legislature has provided no standards. We held there that this failure does not constitute a denial of equal protection of the laws or of due process of law. We observed in that case:

> As we said in *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967), the viciousness and callousness of the killings are matters which the jury necessarily considers in determining whether to impose the death sentence. Circumstances mitigating against it, if shown by the evidence, are also to be considered. The jury does not need express instructions that it should consider these matters. They are all a part of the evidence, and properly considered by the jury in reaching its decision.

The appellant Todd has cited a number of cases from other jurisdictions in which courts have held that the giving of an instruction such as instruction No. 12 is prejudicial error, because it allows the jury to speculate upon a matter which it is not within its province to consider, that is, the possibility of parole. These include *In re Pike,* 66 Cal. 2d 170, 424 P.2d 724, 57 Cal. Rptr. 172 (1967); *People v. Morse,* 60 Cal. 2d 631, 388 P.2d 33, 36 Cal. Rptr. 201 (1964); *Burnette v. State,* 151 So. 2d 9 (Fla. 1963); *Sukle v.*

*People,* 107 Colo. 269, 111 P.2d 233 (1941); *Williams v. State,* 191 Tenn. 456, 234 S.W.2d 993 (1950).

In some jurisdictions, it has been held proper for a jury to consider the possibility of parole so long as the trial court specifically states that this subject is not a matter for consideration and speculation by the jury. *Lee v. State,* 265 Ala. 623, 93 So. 2d 757 (1957); *State v. Conner,* 241 N.C. 468, 85 S.E.2d 584 (1955); *State v. White,* 27 N.J. 158, 142 A.2d 65 (1958); and *Liska v. State,* 115 Ohio St. 283, 152 N.E. 667 (1926).

In spite of all of these authorities to the effect that a jury should not consider the possibility of parole, it is conceded by counsel for both sides on this appeal that juries inevitably do consider these possibilities. The respondent argues that the jury, since it will speculate in spite of all instructions not to do so, should be given the facts so that it can have some basis for its speculations. Appellant Todd, on the other hand, urges that the instruction merely gives the prosecutor the benefit of a judicial pronouncement upon the authority of which he can argue to the jury that the appellant will be paroled in the minimum length of time if he is not hanged. He also argues, and quite persuasively, that the instruction (which merely cites the possibilities) does not give the jury the "facts"—that the facts include the practices of the parole board, the average minimum sentence, the incidence of recidivism, the prospects of rehabilitation, and other factors which influence the parole board in the exercise of its powers.

This argument of appellant Todd leads us to what we consider the most serious vice of an instruction of this kind. It sets a standard where none has been set by the legislature and thus places *undue emphasis* upon one factor which the jury, whether or not it should do so, is bound to take into account. All other factors come before the jury in the form of evidence or of their own experience and knowledge. By instructing the jury concerning the possible minimum sentence which the defendant might serve, the court suggests to the jury that it should give great weight to that possibility in reaching its verdict.

In this case, a surmisal that the jury did give considerable weight to that factor is supported by a showing in the record that the jury sent a note to the judge recommending that the highest possible terms be set for the other two appellants. Perhaps there is slight probability of prejudice in this case, where the evidence of guilt was overwhelming and the callousness manifest; still, when the death penalty is involved, every doubt should be resolved against the state and in favor of the defendant. For this reason, we are of the opinion that it was prejudicial error to give this instruction over the objection of the appellant.

We must necessarily observe that not every defendant considers the instruction prejudicial. In the case of *State v. Smith, supra,* the defendants did not object to the instruction, but simply contended that the court should have instructed, in addition, that the parole board is presumed to do its duty, a concept which, in our opinion, was implicit in the instruction given. In that case, any error in giving the instruction was waived.

█ Since the single error occurring at the trial concerned only the verdict as to the punishment of appellant Todd and not as to the guilt of any of the appellants, a new trial on the issue of guilt is unnecessary. While we have no statutory provision for a bifurcated trial as such, the legislature has sanctioned a trial to determine the degree of the crime and the punishment, where a defendant pleads guilty to murder, in RCW 10.49.010. Here the guilt and the degree of the crime have been determined in a trial free of error affecting those determinations. The legislature in that statute implicitly recognized that, in a proper case, there may be a jury trial on the issue of punishment alone. In its present posture, this is such a case.

The judgments as to the appellants Stewart and Wood are affirmed. The judgment as to the appellant Todd is affirmed on the issue of guilt, but the sentence is set aside and the cause is remanded for a new trial on the issue of punishment.

HUNTER, C. J., HAMILTON, NEILL, and McGOVERN, JJ., concur.

FINLEY, J. (concurring in the result)—I agree with the majority opinion as to defendants Stewart and Wood. As to defendant Todd, I am convinced the instruction given to the jury dealing with the working of the parole system was inadequate, and it is speculative whether the jury was confused or misdirected by this instruction with resulting prejudicial error.[1] Consequently, I am convinced defendant Todd's sentence should be set aside and a new trial ordered solely as to the sentence to be imposed. However, in this connection, I must add that I do not believe that any instruction whatsoever as to the role and functions of the parole board in our system of criminal law administration stating the possibilities of parole for defendant Todd would be necessarily forbidden and grounds for a claim of prejudicial error if it is objected to by the defendant at the time of trial.[2]

Washington's death penalty provision has one unique facet. It is the only instance in our criminal law that the jury enters into the process of penalization or punishment.

---

[1] The instruction is also technically incorrect. The Board of Prison Terms and Paroles, as a matter of policy and statutory interpretation, does not set minimum terms for those prisoners imprisoned on a mandatory life sentence. Such a prisoner is theoretically eligible and can be considered for parole after 13 years and 4 months rather than 13 years and 8 months as indicated in the dubious instruction given.

[2] The majority, while rejecting the implications of the dicta in *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957), indulges in some questionable dicta in the suggestion that such an instruction is only prejudicial "over the objection of the appellant." In capital cases we do not necessarily apply the rule that a failure to object to error at the trial level waives the error on appeal. *State v. Miller,* 164 Wash. 441, 2 P.2d 738 (1931); *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958). An instruction similar to the one at issue here has been used before on a number of occasions, with little or no comment by this court. *See State v. Smith,* 74 Wn.2d 744, 771 n.2, 446 P.2d 571, 588 n.2 (1968); *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967). In the absence of a showing that the instruction was suggested or approved by defendant, it is not at all clear that error could not be presented effectively at this time in a writ of habeas corpus. *Cf. In re Pike,* 66 Cal. 2d 170, 424 P.2d 724, 57 Cal. Rptr. 172 (1967).

In most other cases, the jury is concerned solely with determining whether, beyond a reasonable doubt, the defendant did the alleged act. In making this determination the jurors usually are aided by a plethora of instructions from the trial judge, but they are not concerned with what penalty is to be imposed. Under our indeterminate sentencing procedure that function is performed by the Board of Prison Terms and Paroles. In contrast, in capital cases the legislature has determined that the jury must fulfill the additional and separate function of determining penalization. Again, this function as noted by the majority, is limited to determining whether the ultimate sanction of the common law, the death sentence, is to be imposed.

The delineation of this function from that performed by the Board of Prison Terms and Paroles is a difficult task. The jury, in determining whether a defendant will be executed, must look at a complex of factors involving the makeup of the one individual, the offense to the community, and the evidence of the criminal offense previously introduced. The parole board considers some significantly different factors in determining the time to be served in prison by a defendant given a life sentence. The separation of these functions is a delicate enough task when done by the courts with their considerable experience and knowledge regarding the several factors involved, including those which mark the dividing line. To expect jurors, probably lacking in experience and knowledge about criminal law administration to make this delineation properly without guidance of rational and informative instruction from the trial court seems to me totally unrealistic.

The majority makes the point that neither the legislature nor this court has established any standards to guide the jury in making this decision. Indeed the power and responsibility of the jury are virtually unfettered. In any event, providing a minimal amount of correct information about the function and operation of the parole system is qualitatively different, in my judgment, from imposing a standard which must be considered by the jury. Providing accurate information is simply a realistic recognition of factors

usually considered by the jury coupled with the desirability that these factors be evaluated with a minimum of misconceptions. The majority opinion is predicated upon the assumption that it is best to have a jury operating in ignorance or upon misinformation. Although both parties and the majority opinion concede that the jury very likely will consider the possibility of parole, it is somehow felt that giving the jury a basic outline of how the parole system operates, coupled with additional instruction as to what they can and cannot properly consider is placing undue emphasis upon these matters and results in prejudice to the defendant. I disagree. Individual jurors frequently have some idea of how a parole system operates and many properly or improperly and erroneously apply the information they have in evaluating the practical effect of a term of life imprisonment and whether such sentence should be imposed. To prevent misconceptions, which may either help or hinder the defendant, I believe some basic information about the workings of the parole system should be given the jury. The following is a suggested instruction[3] which might be utilized, I think without prejudicial error to the defendant:

> A sentence of life imprisonment means that the prisoner may be paroled at some time during his lifetime or that he may spend the remainder of his natural life in prison. An agency known as the Board of Prison Terms and Paroles is empowered by statute to determine if and when a prisoner is to be paroled. By statutory enactment, at the very earliest a prisoner will be eligible for parole in 20 years less time off for good behavior.[4]

---

[3]Many jurisdictions apply an instruction similar to the one here recommended, cautioning the jury against considering the future operation of the parole system. *See, e.g., People v. Morse,* 60 Cal. 2d 631, 388 P.2d 33, 36 Cal. Rptr. 201 (1964); *Lee v. State,* 265 Ala. 623, 93 So. 2d 757 (1957); *State v. Conner,* 241 N.C. 468, 85 S.E.2d 584 (1955); *State v. White,* 27 N.J. 158, 142 A.2d 65 (1958). In both *People v. Morse, supra,* and *State v. White, supra,* the court set forth a suggested instruction similar to the one set out herein.

[4]*See* RCW 9.95.115. "Parole of life term prisoners. The board of prison terms and paroles is hereby granted authority to parole any person sentenced to the penitentiary or the reformatory, under a mandatory life sentence, who has been continuously confined therein for a period of

Any prisoner may earn credit for time off his minimum sentence for good behavior. This credit may be as much as one-third of his minimum sentence. Therefore, it is theoretically possible for a person serving a life sentence for murder in the first degree to be eligible for parole in 13 years, 4 months. However, under the laws of this state the Board of Prison Terms and Paroles cannot parole any prisoner unless the superintendent of the penal institution recommends parole and certifies that his conduct and work in prison have been meritorious and the board is convinced that his rehabilitation is complete and he is a fit subject for release. A prisoner released on parole may remain on parole for the rest of his life; if he violates the terms of the parole he may be returned to prison to serve the life sentence.

So that you will have no misunderstanding relating to a sentence of life imprisonment, you have been informed as to the general scheme of our parole system, which you may consider in determining the punishment for this defendant. However, you are cautioned it is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment is the proper sentence, you must assume that those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner and that they will not parole this defendant unless he can be safely released into society. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Board of Prison Terms and Paroles will properly carry out its responsibilities.

HALE, J. (dissenting)—

Judges shall not charge juries with respect to matters of fact, nor comment thereon, *but shall declare the law.*

---

twenty consecutive years less earned good time: *Provided,* The superintendent of the penitentiary or the reformatory, as the case may be, certifies to the board of prison terms and paroles that such person's conduct and work have been meritorious, and based thereon, recommends parole for such person: *Provided,* That no such person shall be released under parole who is found to be a sexual psychopath under the provisions of and as defined by chapter 71.12."

(Italics mine.) Const. art. 4, § 16. Through instruction No. 12, the court, I think, declared the law as it applied to the alternative punishments, life imprisonment or death. In giving this instruction, the court did no more than inform the jury in particular of what they knew in general, that life imprisonment is not necessarily imprisonment for life but may, as fixed by the Board of Prison Terms and Paroles, become a far shorter term. It enabled the jury rationally to apply the law governing punishment to the facts of the case—all in accordance with their sworn duty.

True, an instruction explaining sentences would be inappropriate in cases of lesser felonies. In such cases, the jury is correctly charged that they have no concern with the punishment. But in cases of murder in the first degree, the situation is drastically different, for there a verdict of guilty places upon the jury the inexorable duty of deciding whether the death penalty shall be inflicted.

Choice is, therefore, implicit in rendering a special verdict on the death penalty. In imposing it or negating it, the jury has to choose between one or the other. Although from their experience as mature individuals jurors know what the death penalty means and although presumed to know the law, they are, I think, quite unlikely to know, and except from the trial judge have no means of learning, what the law means as to the alternative punishment—life imprisonment. Thus, in giving instruction No. 12, the court has done no more than the constitution requires in the premises—declare the law. That the instruction should not be deemed reversible error is demonstrated by the nice degree of discernment shown by the jury in this case. Of three men found guilty in the first degree of the same murder in the same trial, the same jury imposed the death penalty on defendant Todd only. Instruction No. 12 enabled the jury to exercise a rational choice in a trial where a choice had to be made.

Considerations of punishment ought not be allowed to affect the jury's collective judgment as to guilt or innocence. Accordingly, in cases where the function of the jury is solely to ascertain guilt or innocence, it should not con-

sider whether or to what extent punishment will be imposed, for the question of punishment is immaterial to guilt or innocence and is a matter exclusively for the court on conviction. But if the major responsibility in imposing punishment rests by law on the jury and the judicial power to ordain death devolves exclusively upon them, then the jury, I think, is entitled to know the law which governs these vital matters. To say, as does the majority, that the jury does not choose between penalties but only whether to take or spare the accused's life, postulates, I think, an inherent contradiction. The jury cannot, if it finds the defendant guilty, escape the awesome choice. It must return a special verdict stating whether or not the death penalty shall be inflicted. RCW 9.48.030. In choosing the death penalty, the jury thus ipso facto rejects life imprisonment and vice versa.

Although I do not believe instruction No. 12 amounts to reversible error, it is, I think, like many other time-tested instructions, susceptible of improvement. I would prefer the instruction in the form recommended by Justice Finley in his concurring opinion.

The point is not entirely novel. This court passed directly on the question of whether the jury, in a capital case, could consider the possibility of imprisonment and parole versus imposition of the death penalty in *State v. Buttry*, 199 Wash. 228, 90 P.2d 1026 (1939). There, discussing comments made by a prosecutor during a murder trial, we said, at page 251:

> There are cases which hold that, where the prosecutor suggests that, if the death penalty be not inflicted, the accused may be soon released by some future governor or parole board, a conviction should be set aside and a new trial granted. But the great weight of authority is to the contrary, especially where the prosecutor does not attempt to state statistical facts, but, as the prosecutor did in the case at bar, merely suggest such a possibility.
>
> "The declaration by the prosecutor that, if the prisoner were sentenced to life imprisonment, he would be liberated in a few years, and would return home to enter upon a new course of crime, was no statement of fact

bearing on the guilt of the accused, but a mere expression of opinion or guess, which the intelligence of the jury would rate only as such. And, indeed, was it a reprehensible opinion? The jury was the sole judge whether the prisoner should die or suffer lifelong imprisonment, as the law lodges that discretion with it. By what considerations is the jury to exercise this discretion? Certainly, it can look at the hue of the crime as revealed by the evidence; and can not the jury consider whether the circumstances of the crime show its perpetrator to be a desperate man, and an enemy of society, and dangerous, should he escape or be pardoned?" *State v. Shawn*, 40 W.Va. 1, 20 S.E. 873.

For additional examples of this class of cases, see: *McNeill v. State*, 102 Ala. 121, 15 So. 352, 48 Am. St. 17; *Wechter v. People*, 53 Colo. 89, 124 Pac. 183; *State v. Junkins*, 147 Iowa 588, 126 N.W. 689; *Bolin v. Commonwealth*, 206 Ky. 608, 268 S.W. 306.

Many jurisdictions, including our own, have held it not reversible error if it be stated in argument that the average term of a man sentenced to life imprisonment in the penitentiary is not more than eight years, or that it is a matter of common knowledge that life sentences mean only ten or twelve years in prison, even though there is no evidence to that effect in the record. In *Sullivan v. State, supra* [*Sullivan v. State*, 47 Ariz. 224, 55 P.2d 312 (1936)], the court said, in part:

"But were the remarks of the county attorney, as set forth in the motion for new trial, such as to require a reversal of the case? It is alleged (a) that he referred to the defendant, in his argument, as 'nothing but a low down murderer,' and (b) that he requested the jury to fix the penalty of death rather than life imprisonment, because the average prisoner sent up for life only serves on an average of eight years, and that, if the defendant received a life sentence, he would probably be paroled in eight years and thrown on society to kill and murder again."

It was held that these remarks did not constitute reversible error. See, also, *State v. Stratton*, 170 Wash. 666, 17 P.2d 621, and the very recent (1938) opinion of this court in *State v. Knapp*, 194 Wash. 286, 77 P.(2d) 985.

In jurisdictions where a verdict of guilty in the first degree results automatically in sentence of death, unless the jury specifically recommends imprisonment for life, it

is quite common for juries to come back into court and ask for an instruction as to whether, if the life sentence be recommended, the defendant can afterwards be pardoned or paroled. An instruction that he can be pardoned and paroled, given under such circumstances, is held not to be prejudicial. *Liska v. State*, 115 Ohio St. 283, 152 N.E. 667; *State v. Carroll*, 52 Wyo. 29, 69 P.(2d) 542; 51 Harvard L. R. 353.

It has been said by the supreme court of New Jersey that whether the defendant can be pardoned, if given a life sentence, is "naturally one of the elements to be considered by the jury" in determining whether sentence of death or life imprisonment shall be imposed, and that there is no reason why it should not be instructed in the first instance as to the existence of the parole and pardoning power. *State v. Rombolo*, 89 N.J.L. 565, 99 Atl. 434; *State v. Carrigan*, 93 N.J.L. 268, 108 Atl. 315.

Comments upon the alternative punishments prescribed by law for first-degree murder were not deemed error when we subsequently expressed approval of *Buttry* in *State v. Baker*, 30 Wn.2d 601, 192 P.2d 839 (1948). We referred without disapproval to an instruction relating to parole in *State v. Smith*, 74 Wn.2d 744, 771, 446 P.2d 571 (1968). *See also, Prejudicial Effect of Statement of Prosecutor as to Possibility of Pardon or Parole*, Annot., 16 A.L.R.3d 1137 (1967). The precise question arose in *State v. Leland*, 190 Ore. 598, 227 P.2d 785 (1951), when reference by the court during voir dire to the alternative punishment to death and the operation of the laws relating to parole in cases of life imprisonment was held not reversible. The Supreme Court affirmed this decision (*Leland v. Oregon*, 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952)), and denied rehearing, 344 U.S. 848, 97 L. Ed. 659, 73 S. Ct. 4 (1952). *Accord: State v. Carrigan*, 93 N.J.L. 268, 108 A. 315, *aff'd*, 94 N.J.L. 566, 111 A. 927 (1920); *Commonwealth v. Sykes*, 353 Pa. 392, 45 A.2d 43, *cert. denied*, 328 U.S. 847, 90 L. Ed. 1620, 66 S. Ct. 1021 (1946); and *Bland v. State*, 211 Ga. 178, 84 S.E.2d 369 (1954), in which latter jurisdiction a mandatory instruction is given that the jury will disregard statements of *counsel* concerning the possibility of pardon or parole.

In sparing the life of two of the defendants while at the same time imposing the death penalty on defendant Todd, the jury ineluctably made a choice. *State v. Carpenter,* 166 Wash. 478, 7 P.2d 573 (1932). Compelled by law in the event the verdicts were guilty to make three of a possible six choices concerning the death penalty, in my opinion it was, therefore, appropriate that the jury be properly informed as to the law governing those choices, and I would not deem the instruction reversible error.

The court, however, in reversing because of instruction No. 12, nevertheless affirms the judgment of conviction and reverses the sentence only. I dissent to this bizarre procedure, for I find no basis whatever for it in the code of criminal procedure. Except where a plea of guilty has been entered to a charge of murder in the first degree, the statutes make no provision for a jury other than the one which tried the case to try the issue of punishment. If an accused pleads guilty to murder in the first degree thereby totally acknowledging his guilt and irrevocably resolving that issue, then and only then, in my opinion, can a jury be limited to the issue of punishment. On this basis alone, a judgment and sentence of life imprisonment which showed on its face that it had been entered on a plea of guilty to the crime of murder in the first degree was held void and the cause remanded for trial by jury on the issue of punishment because only the jury has the power to decide between death and life imprisonment. *In re Horner,* 19 Wn.2d 51, 141 P.2d 151 (1943). After retrial of *Horner,* this court on appeal again held only the judgment and sentence void and not the information, arraignment and entry of plea because the issue of guilt or innocence had been fully resolved by plea of guilty. Holding that the matter of punishment rested exclusively with the jury, we affirmed the principle that, on a plea of guilty to murder in the first degree, a jury had to be impaneled to try the issue of punishment. *State v. Horner,* 21 Wn.2d 278, 150 P.2d 690 (1944). Not so, however, where the charge is murder in the second degree, for there on plea of guilty the jury has no judicial function and the court cannot impanel or permit a

jury to hear testimony and determine the degree of the homicide. That issue has already been resolved by plea to the information. *Brandon v. Webb*, 23 Wn.2d 155, 160 P.2d 529 (1945).

It is impossible, I think, to read the statutes of criminal procedure as the court has done so as to segregate the issues and thus enable one jury to decide guilt and another punishment.

> Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted;
> . . .

RCW 9.48.030. If, for example, no one enters a plea of not guilty by reason of insanity on the accused's behalf and it is proved that the claimed insanity was not known to anyone authorized to interpose the plea, it may be interposed "at any time . . . before the submission of *the* cause to *the* jury." (Italics mine.) RCW 10.76.020. It is highly unlikely that this section means any jury other than the jury which will try the case and fix the punishment in event of a verdict of guilty of a capital crime. If a plea of insanity is entered, the court must instruct *the* jury and supply it with forms for the return of special verdicts. RCW 10.76.030. If *the* jury finds the accused sane but that he committed the crime charged while insane, that same jury must decide whether he is still insane. If it finds him insane at the commission of the crime but sane at trial, it must decide whether the accused is likely to suffer a relapse or recurrence of the insanity and must return its findings accordingly by special verdict. RCW 10.76.040.

Other sections of the criminal code imply that the jury which decides the issue of guilt must also decide the issue of capital punishment. A list of petit jurors must be furnished the accused. RCW 10.46.030. Issues of fact shall be tried by a jury of 12. RCW 10.49.020. In capital cases, the defendant and the state are each allowed 12 peremptory

challenges. RCW 10.49.060. The court may provide for alternate jurors. RCW 10.49.070. And the jury—presumably *the* jury which will try the case—takes a prescribed statutory oath to make a true deliverance or a true verdict. RCW 10.49.100. Juries in criminal cases—apparently the whole case—shall be kept together except by consent of the prosecuting attorney and the accused. RCW 10.49.110.

Defendant Todd's guilt of murder in the first degree has been ascertained by the jury which imposed the death penalty. If, as the majority holds, the court committed reversible error in giving instruction No. 12, that error under our statutes necessarily inheres in the special verdict as well as in the general verdict which declared him guilty, and he should have a new trial on all issues. The statutes, I think, admit of no other sensible construction and, accordingly, I would adhere to my dissenting opinion on this point in *Hawkins v. Rhay*, 78 Wn.2d 389, 474 P.2d 557 (1970).

I see nothing in the whole statutory scheme governing the trial of capital cases which allows the court to order separate juries to try the issue of guilt and the issue of capital punishment and, therefore, I dissent to a retrial of that sole issue. If the case must be retried, it should, in my opinion, be retried in full as to all issues joined by the information and the plea.

February 23, 1971. Petition for rehearing denied.