[No. 29908. Department Two. November 18, 1946.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM JENNINGS COOPER, *Appellant.*[1]

[1]Reported in 174 P. (2d) 545.

*Miracle & Treadwell* and *Sullivan & Pruzan,* for appellant.

*Lloyd Shorett, Max R. Nicolai, James D. McCutcheon, Jr.,* and *John J. Kennett,* for respondent.

MALLERY, J.—Appellant, William Jennings Cooper and Edward Ervin Mitchell, his codefendant, who has not appealed, were jointly informed against for murder in the first degree. It was charged that:

"They, . . . and each of them, in the county of King, State of Washington, on or about the 8th day of August, 1945, acting in concert with a premeditated design to effect the death of one Walter Bernard Foley, Jr., a human being, wilfully, unlawfully and feloniously, then and there did shoot at, toward and into the body of the said Walter Bernard Foley, Jr., with a certain deadly weapon, to-wit: a .38 calibre revolver, then and there had and held by the said Edward Ervin Mitchell, from which said mortal wounds the said Walter Bernard Foley, Jr., then and there died."

Pleas of not guilty were entered by both. During the course of the trial, Mitchell took the stand and turned state's evidence. The jury found both defendants guilty of the crime charged.

The state introduced evidence to show that the victim, Foley, was shot to death by a .38 calibre revolver at approximately six twenty-five on the morning of August 8, 1945, at a point in King county thirteen miles north of Seattle on the Kenmore-Juanita cutoff. Foley, a student at the University of Washington, had previously been employed as an

investigator by the Washington state liquor control board, having been discharged for cause in July, 1945. His duties in that capacity had been to frequent speakeasies, make illegal purchases of liquor therein, and give evidence in subsequent prosecutions for liquor violations.

The appellant, Cooper, managed the Menlo Hotel in Seattle, and, in the basement thereof, he operated the "614" or "Madison" club, where liquor was illegally sold. Mitchell, Cooper's codefendant, was a newcomer to Seattle and a bartender by trade. Prior to August 8, 1945, he had attempted to obtain employment with appellant. At the time of the offense charged herein, he was merely a patron of the "614" club.

At about eleven p. m. on August 7, 1945, the "614" club was raided by the Seattle police, the visible liquor stock was confiscated, and the employees and patrons were booked and fined. Appellant, who had been absent at the time of the raid, returned from Cle Elum shortly before midnight and, at about one a. m. on August 8th, reopened the club. Mitchell had been caught in the raid but was among the first to return to the club and, upon its reopening, acted as bartender for a few minutes until the regular bartender returned and took over. Mitchell then reverted to his status as a patron and resumed his drinking.

Shortly after one a. m. on August 8th, Foley made his appearance at the door of the club and requested a membership card. He was refused a card but nevertheless was permitted to enter and to order a drink. Foley was recognized at once by Bob Farley, one of Cooper's bartenders, then off duty, as being an investigator. His suspicions aroused, Farley took Mitchell and another patron to a different club, where Farley checked up on Foley's identity. Upon their return to the "614" club, Farley informed Cooper of Foley's connection with the liquor board. Cooper immediately confronted Foley with this information, whereupon Foley further identified himself by producing his driver's license and requested that they go somewhere to talk in private. Upon reaching Cooper's room, Foley suggested that he could "protect" Cooper. Cooper and Foley

then left the "614" club and visited the "92" club, where, in separate conversations with the owner, Ray Murray, the idea was conveyed to Cooper that he had better pay Foley for protection. Foley and Cooper returned to Cooper's room, where Cooper paid Foley one hundred dollars, and they then went back downstairs to the "614" club.

At Coopers request, Foley was thereafter and without his knowledge served double-strength drinks. Cooper, who carried a revolver and was very disgruntled, made it known to several people in the club that he intended to get even with Foley. Subsequently, Cooper offered Mitchell five hundred dollars to help him accomplish this purpose. Mitchell, who was penniless, readily agreed to assist. Both Foley and Mitchell were very drunk when, at a time between 4:15 and 4:45 a. m., they and Cooper set out from the "614" club in Foley's car. Upon arriving at the scene of the crime, Cooper, who was driving, stopped the car. Mitchell stepped out from the right side of the car and walked toward the rear, intending to relieve himself. Cooper walked around to meet him and asked, "Is this a good place to dump him?" Mitchell agreed that "it was as good as any," and they proceeded to remove the half-conscious Foley from the car. Mitchell testified:

"Q. Then tell us what happened. A. He got out of the car and took several steps to the rear of the car, which would be toward the Bothell Highway, and Cooper had the gun on him at that time, and he was cursing him, his exact words I don't know—and I wouldn't prefer to state them in front of the jury—but he was cursing him and he said 'Now you are going to get yours.' Those were the only words I remember him saying. Q. What happened at that time? A. Foley had his hands lifted about shoulder high, maybe a little higher (indicating), and he brought one on down, I don't know which it was, toward the inside of his coat. Q. What happened then? A. And when he did that I grabbed Cooper's gun from his hand and shot him."

Cooper and Mitchell left Foley where he fell, returned to the north end of Seattle in Foley's car, abandoned the car in a residential district, boarded a city bus to the downtown district whence they traveled by taxicab to their respective

hotels, having separated in the downtown area between 6:50 and 7:10 a. m. Later that day, Cooper paid Mitchell a portion of the promised five hundred dollars and admonished him to get out of town. It was conclusively proved that Cooper's revolver was the murder weapon.

The defense was alibi. Cooper produced five or six witnesses who testified that he was in or about the Menlo hotel at the time the crime was committed.

Appellant makes fifteen assignments of error, none of which questions the sufficiency of the evidence to sustain the verdict.

The assignments chiefly relied upon by appellant relate to his contention as set forth in his brief that:

"The appellant, Cooper, was charged with being at a certain place at a certain time and then and there acting in concert with the defendant, Mitchell, as a principal in the commission of the alleged murder; and it may be further observed that the amended information did not in any manner charge appellant with aiding, assisting, abetting, advising, encouraging or counseling the perpetration of the alleged crime. For the dual reason that the amended information charged specifically that the appellant was in a particular place at a particular time and engaged as a principal acting in concert with his codefendant in the commission of the alleged crime, and, secondly, from the failure to allege any facts concerning aiding and abetting, the appellant was not put upon notice of any such charge or that any such testimony would be offered."

Appellant further contends that, under such circumstances, it was error to submit to the jury instructions relating to aiding and abetting.

In support of his arguments, appellant cites the early case of *State v. Gifford,* 19 Wash. 464, 53 Pac. 709, the rule of which, in subsequent decisions of this court, has been confined to its own peculiar set of facts and does not apply to the situation at bar. The information in the *Gifford* case, *supra,* charged the defendant as a principal with the crime of rape "committed as follows, . . . then and there unlawfully and feloniously did carnally know one Flossie Fuller." The proof, however, showed that Gifford was a

procurer only and was not present at the scene of the crime of rape. It was there held that the information was bad, the court saying:

"The accused may be indicted, and must be, under the provisions of this law [referring to Bal. Code, § 6782 abolishing distinctions between principals and accessories] as a principal, but the acts constituting the offense must be set forth."

A critical analysis of the *Gifford* case, *supra,* is to be found in *State v. Nichols,* 148 Wash. 412, 269 Pac. 337, where three boys were charged as principals with the crime of burglary and were tried together. All of the defendants were convicted, and Nichols appealed on the ground that the proof failed to show that he performed the physical act of breaking in and thus was not a principal as charged, but was, at most, only an accessory before the fact and should have been informed against as such. In upholding the validity of that information, we said:

"Counsel rely on the doctrine announced in the case of *State v. Gifford,* 19 Wash. 464, 53 Pac. 709. In the earlier case of *State v. Duncan,* 7 Wash. 336, 35 Pac. 117, 38 Am. St. 888, it was held that, under the statute abrogating the distinction between an accessory before the fact and a principal, a defendant may be convicted under an information charging him with the commission of a larceny as principal, although the evidence shows that he was not present at the time the taking was done, but advised and counseled it with the intention of receiving the benefits of the property taken. In the *Gifford* case, while it is true the court said the *Duncan* case ought to be overruled, that statement was modified by immediately saying . . .

" ' . . . and, in any event, it seems that it would be an inconsistent rule to apply to the case at bar.'

"That case was one in which, under the proof, it was impossible that the defendant, charged as a principal, could have committed the act upon which the crime charged had its foundation; hence the apparent departure from the *Duncan* case, out of respect for the general rule that the act or omission constituting the crime must be set forth in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended. It was shown that Gifford was only a procurer and was not present at the time the crime was committed,

and that to avoid a positive conflict between the proof and pleading, under the particular circumstances of the case, and at the same time enable the defendant to know what was intended, that he should have been charged with the crime

" ' "committed as follows: By procuring," etc., instead of by alleging another and entirely different state of facts.'

"If one is charged with a criminal act which the state's proof shows it was impossible for him to have committed, he has nothing to answer, while if he committed a crime related to the one impossible for him to have committed, the information should set out only what he did. The *Duncan* case was not that kind of a case nor is the present one."

In *State v. Dickey,* 181 Wash. 249, 42 P. (2d) 790, we further commented upon the *Gifford* case, saying

". . . the cases of *State v. Gifford,* 19 Wash. 464, 53 Pac. 709, and *State v. Morgan,* 21 Wash. 355, 58 Pac. 215 [also cited by appellant], are not in point, because in each of those cases there was no attempt to prove that the accused was guilty of the charge preferred against him."

In charging appellant as a principal, the state followed the mandate of Rem. Rev. Stat., § 2260 [P.P.C. § 112-13], which provides that:

"Every person concerned in the commission of a felony, gross misdemeanor, or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, *and shall be proceeded against and punished as such.* . . ." (Italics ours.)

There was no variance between the information and the state's evidence, which showed that the appellant both hired Mitchell to kill Foley and accompanied him and Foley on the latter's death ride. Every person implicated in the commission of a felony as an accessory is a principal and is to be proceeded against as such. The prosecuting attorney, in drawing up an information, is not bound to elect between charging a defendant as a principal or as an accessory before the fact. Under the terms of the statute, he may ask for a verdict of guilty if the evidence is sufficient to satisfy the

jury upon either theory. *People v. Latona,* 2 Cal. (2d) 714, 43 P. (2d) 260. He may charge all defendants as principals, and, except in an unusual situation such as that presented in *State v. Gifford, supra,* the defendants are thereby sufficiently put upon notice as to the nature of the charge. Hence, under an information charging two or more defendants as principals, instructions as to aiding and abetting are proper. *State v. Ikeda,* 130 Wash. 325, 227 Pac. 14; *State v. Curtis,* 127 Wash. 273, 220 Pac. 769; *People v. Latona, supra; State v. Silverman,* 148 Ore. 296, 36 P. (2d) 342.

The court's instruction No. 41 reads as follows:

"You are instructed that if you find beyond a reasonable doubt that the defendant Cooper directly or indirectly aided, assisted, abetted, advised, encouraged or counseled the defendant Mitchell to kill Walter Bernard Foley, Jr., and if you further find beyond a reasonable doubt that the defendant Mitchell did kill Walter Bernard Foley, Jr., then and in that event the defendant Cooper would be guilty to the same extent as the defendant Mitchell, even though you should find that the defendant Cooper was not personally present at the scene of the killing."

■ Error is assigned on the giving of this instruction upon the ground that it does not require a finding by the jury that Cooper's encouragement and counseling actually induced the killing; that is to say, a finding that but for Cooper's acts, the killing would not have occurred. The evidence did not warrant any different instruction. The five-hundred-dollar reward offered by Cooper to Mitchell was a sufficient inducement, even if Mitchell had also had an independent motive. No such motive, however, is inferable from any evidence in the case.

■ Appellant further objects to the above instruction because it does not negative the possibility that the killing might have been excusable or justifiable. The degrees of homicide were fully discussed in other of the court's instructions. One instruction cannot give all the law applicable to a case. If the instructions as a whole state the law, they are sufficient.

Appellant objects to the court's instruction No. 45 which reads:

"To convict the defendant Cooper of the crime of murder in the first degree, the State must satisfy you beyond a reasonable doubt of all of the following elements: . . .

" (4-a) That the defendant Cooper acted in concert with the defendant Mitchell in the killing of said Walter Bernard Foley, Jr., or

" (4-b) That the defendant Cooper, not being present, directly or indirectly aided, assisted, abetted, advised, encouraged or counseled the said killing of the said Walter B. Foley, Jr."

Appellant contends that this instruction was erroneous in that, while the information contained only one way in which the crime could have been committed, two ways have been submitted for the consideration of the jury in arriving at its verdict. He cites *State v. Severns,* 13 Wn. (2d) 542, 125 P. (2d) 659, in which the defendant was charged, under Rem. Rev. Stat., § 2435 [P.P.C. § 118-181], subd. (2), with having committed rape by forcibly overcoming the resistance of the prosecutrix. The court there instructed that rape could be committed either by the physical overcoming of the prosecutrix' resistance or by placing her in fear of great bodily harm so as to prevent her resistance. This instruction was held grounds for reversal, the court saying:

"We are firmly of the opinion that, where, as in the instant case, the information charges that the crime was committed in a particular way, *under one subdivision of a statute,* it is error for the trial court to instruct the jury, as was done in this case, that they might consider *other ways* or means by which the act charged might have been committed, regardless of the range which the court may have permitted the testimony to take." (Italics ours.)

The court was there discussing the different means of committing a crime which were provided for under separate sections of the statute, and which were held to be duplicitous when both were relied upon. However, it was not there concerned with the theory of aiding and abetting in the commission of a crime.

A means of committing a crime employed by a principal does not become duplicitous by merely implicating an aider or abettor. The statute would be meaningless if so interpreted.

A case upon this point is *State v. Klein,* 195 Wash. 338, 80 P. (2d) 825, wherein we said:

"Appellants complain of instruction No. 11, which concerned the matter of aiding and abetting, and principal and accomplice. By this instruction, the jury were told that, if they believed that appellant Cole committed the burglary, *and that appellant Klein was either assisting in the breaking and entering, or aided and abetted the same,* then appellant Klein might be found guilty as charged. As above stated, there was some evidence that appellant Klein had, on the afternoon prior to the arrest, been admitted to the lavatory on the third floor of the building. Evidently, the instruction was given upon the theory that the jury might have believed that appellant Klein secreted himself in the building, and either assisted appellant Cole to break in or joined him after the breaking had been accomplished. The instruction was warranted by the evidence, and under no theory can be deemed prejudicial." (Italics ours.)

So, here, the instruction was warranted by the evidence and thus was properly given.

Upon the ground that it unduly emphasized a portion of the evidence, appellant has assigned error upon the court's instruction No. 12, relating to fraud in the preparation of his case. Such contention is without merit. See *Wood v. Miller,* 147 Wash. 251, 265 Pac. 727.

Error is assigned upon the giving of instruction No. 15. This instruction, read together with No. 16, correctly states the law concerning admissions and confessions. An omission from an instruction that is elsewhere supplied is not error. It is sufficient if the instructions as a whole constitute a correct statement of the law.

Appellant assigns error upon the ground that the trial court commented upon the evidence before the jury. The county engineer had just been on the witness stand at which time several maps had been introduced by the state, among them, one showing the scene of the crime. The state then put on Mr. Hausner, who testified as to the discovery by him of Foley's body, and the following occurred:

"THE COURT: I do not recall whether the witness Wilkins testified to this area, where it was, shown on the map. MR. KENNETT: Thank you. Q. Is this place where you saw the

body located in King County, Washington? A. Yes, sir. A. You know that of your own knowledge? A. Yes, sir. Mr. Kennett: That is all."

Appellant contends that, since the location of the killing was a jurisdictional element in the proof of the crime, the judge's action amounted to a comment on the evidence in violation of Art. IV, § 16 of our state constitution.

"The constitutional provision that the trial judge shall not comment upon the evidence means no more than that the trial judge is prohibited from action or words having the effect of conveying to the jury the trial judge's personal opinion as to the truth or falsity of any evidence." *State v. Brown*, 19 Wn. (2d) 195, 142 P. (2d) 257.

Measured by this standard, the trial court's action did not amount to an unlawful comment.

Appellant assigns as error the trial court's denial of his motions for a separate trial, a mistrial, and for a continuance. These motions were based upon the following occurrence.

Near the end of the prosecutor's reading of Mitchell's complete confession, Mitchell suddenly arose and declared: "I wish to verify these statements." The jury was immediately sent out and Mitchell was questioned to determine the meaning of his action. He maintained that he wished to become a witness. After being advised of his constitutional rights, Mitchell was endorsed upon the prosecutor's list of witnesses on the court's own motion and was permitted to testify, whereupon counsel for appellant made and argued the aforementioned motions.

Appellant argues that Mitchell had not been endorsed upon the state's list of witnesses, and that, in allowing him to testify as a witness for the state, the court violated the provisions of Rem. Rev. Stat., § 2050 [P.P.C. § 131-1], which requires that,

"... at the time the case is set for trial the prosecuting attorney shall file with the clerk a list of the witnesses which he intends to use at the trial and serve a copy of the same upon the defendant, ... Either party may add such additional names at any time before trial as the court may by order permit, ..."

 This court has many times construed this section of the code, though never, so far as we are able to find, in a situation where the witness in question was a codefendant. The purpose of the statute, according to the opinion of this court in *State v. Thomas,* 8 Wn. (2d) 573, 113 P. (2d) 73, "is to safeguard the state against surprise defenses and afford it time and opportunity to attack the testimony of unscrupulous defense witnesses." We think that this statute, which requires that both parties serve a list of witnesses, is designed to protect both parties from surprise. However, the fact that two defendants are jointly charged is notice to each that the other may become a witness. *Edwards v. State,* 171 Ark. 778, 286 S. W. 935. That the witness may be hostile is not the kind of surprise contemplated by the statute. See, also, *State v. Everitt,* 14 Wash. 574, 45 Pac. 150; *State v. McGonigle,* 14 Wash. 594, 45 Pac. 20.

In *State v. Gaines,* 144 Wash. 446, 258 Pac. 508, the name of a new state's witness was endorsed towards the close of the state's case upon a Thursday afternoon. The witness testified on Friday. On Saturday morning, the defendant moved for a continuance until the following Tuesday at 9:30 a. m., but the court allowed a continuance only until 9:30 a. m. on Monday. In affirming the case, we said:

"Whether a continuance shall be granted, when an additional name or names are endorsed upon an information during the trial of a criminal case and the extent thereof, *rests largely in the discretion of the trial court,* and this court will not disturb the ruling of that court, unless it appears that the discretion has been abused. *State v. Conner,* 107 Wash. 571, 182 Pac. 602; *State v. Wallace,* 114 Wash. 586, 195 Pac. 993. We cannot say in this case that the court abused its discretion in refusing the continuance for a day, in addition to that which was allowed." (Italics ours.)

 In the case at bar, the motion for continuance was made shortly before noon on Friday. The court had already informed counsel that, because Mr. Sullivan, counsel for the appellant, was required to be in the Federal court on Saturday, there would be no session of his court upon

that day. Upon denial of the motion, proceedings were resumed, and the remainder of Friday afternoon was devoted to direct and cross examination of the codefendant Mitchell, the cross-examination being partly based upon written statements made by Mitchell and previously examined by counsel for the defense. When court again convened on Monday, the cross-examination of Mitchell was continued. The record shows affirmatively that, in denying the motion for continuance, the court was partly influenced by the fact that appellant was represented by two counselors, so that, notwithstanding the fact that Mr. Sullivan's presence was required elsewhere on Saturday, in reality they had two full days to prepare for the remainder of their cross-examination of Mitchell. Under the circumstances, we think that the trial court did not abuse its discretion, and that appellant's motions were properly denied.

One of the defense witnesses, Betty Arnold, was interrogated by the prosecuting attorney concerning the various names used by her at various times and in different cities. She was then asked: "Q. What is your business now? A. I am not working. Q. As a matter of fact you are a prostitute, are you not?" Counsel for appellant immediately objected, whereupon the court held that the question was proper and advised the witness that she need not answer if she felt her answer would incriminate her. She refused to answer, and the matter was dropped. Error is assigned upon this incident. The appellant was not prejudiced. The question, although proper (see *State v. Coella,* 3 Wash. 99, 28 Pac. 28), was not answered by the witness.

Appellant assigns error upon the refusal of the court to permit certain cross-examination of the witness Rita Peck. If the court did originally commit error in this respect, it was harmless, since the appellant subsequently adduced the desired testimony by putting the witness on the stand in furtherance of his own case. See *State v. Coates,* 22 Wash. 601, 61 Pac. 726.

Appellant assigns error upon certain cross-examination by the prosecution of one of the alibi witnesses, a Mr. McDonald, the purpose of which was to show his hostility

toward the special prosecuting attorney, resulting from his having been previously charged with a crime by that attorney. We cannot say that the trial court abused its discretion in allowing such cross-examination. The ruling will not be disturbed. See *State v. Robinson*, 24 Wn. (2d) 909, 167 P. (2d) 986.

The judgment is affirmed.

STEINERT and CONNELLY, JJ., concur.

SIMPSON, J., concurs in the result.

January 25, 1947. Petition for rehearing denied.

