STEVEN RAY CLARK v. STATE OF INDIANA.

[No. 874S168. Filed May 27, 1976. Rehearing denied August 16, 1976.]

Malcolm G. Montgomery, of Evansville, for appellant.

Theodore L. Sendak, Attorney General, Darrel K. Diamond, Assistant Attorney General, for appellee.

DEBRULER, J.—Appellant, Steven Ray Clark, was charged by affidavit with physical infliction of an injury by a deadly weapon while engaged in a robbery, Ind. Code § 35-13-4-6, being Burns § 10-4101. In a jury trial, on February 13-15, 1974, appellant was found guilty as charged and sentenced to life imprisonment. He timely filed a motion to correct errors, which was overruled.

On appeal, appellant presents three contentions: that the evidence identifying him as one of the perpetrators of the crime was insufficient; that the court erred in allowing the State to elicit, as evidence of bias, the fact that the father of appellant's alibi witness had been convicted the previous week; and that five remarks of the prosecuting attorney were so prejudicial as to deny appellant a fair and impartial trial.

The evidence which supports the verdict of the jury shows that William J. Tornatta, a taxi driver, received a call over his radio about 2:00 a.m., August 5, 1973, which directed him to a certain restaurant. The radio informed him that the call had been made from a phone booth, and, as he passed the phone booth closest to the restaurant, he saw that the receiver was hanging loose. At that moment, two men called out to him, and he turned around to pick them up. When he stopped, he was under a street light and the dome light inside his car was on. Appellant got in the back seat and the other man, George Willis Copeland, got in the front. When Copeland told Tornatta to drive down a street and gave him no specific address, Tornatta became suspicious. He had been robbed three or four

times before. Looking in his mirror, he noticed that appellant kept looking around. Finally, appellant directed him to go to a certain corner. When Tornatta reached that corner, he switched on his dome light.

At that point, Copeland pulled a gun from his belt and said this was a stick-up. He poked the gun in Tornatta's ribs and continued to jab him with it during the whole period of the robbery. Tornatta told Copeland his money was in his shirt pocket, and appellant reached over and got the money out of the pocket. Copeland asked if he had more money, Tornatta held up his moneychanger, and appellant took it. Again asked if he had money, he got out a small coin purse and gave it to Copeland. Asked again, Tornatta gave Copeland his billfold and bankbook. Finally, Copeland asked him if he had a watch, and appellant took it off his wrist. Copeland asked if that was all Tornatta had, and he said it was.

Copeland then ripped the cab microphone out and threw it in the back seat, stomped the radio out of its carrier, and bent back the sealed door of the glove compartment. Then he opened the right hand door and got out. As he got out, he said, "Okay, man," and appellant struck Tornatta on the head with a blackjack. Appellant then hit him again. Tornatta put his hands over his head, and appellant continued to hit him with the blackjack. Finally, Tornatta grabbed the door, opened it, got out, turned around and just barely kicked appellant on the leg. Appellant and Copeland ran down the street, but Copeland got ahead of appellant because appellant had a hard time running and limped a little. Tornatta estimated that appellant and Copeland were in his cab for about thirty minutes.

Tornatta's pants and shirt were covered with blood and his head was bleeding badly. He walked down the street until he found someone who would call the police for him. When the police arrived, they took him to the hospital.

Appellant's first argument is that Tornatta's identification of appellant is unreliable, because Tornatta's opportunity to

observe, description of appellant, and uncertainty make his identification suspect. Appellant notes that it was dark at the time of the robbery, that Tornatta testified positively that Clark was darker than Copeland and yet Copeland is the darker of the two, and that Tornatta also testified that there was always the possibility of an error.

Tornatta was with the two men for thirty minutes. He picked them up under a street light and had the dome light in his cab on when they got in. He was immediately suspicious and watched appellant in the mirror as he drove. He had the dome light in his cab on while appellant and Copeland robbed him. He saw appellant again when he kicked him and watched him as he ran away. Tornatta testified that he had the opportunity to look at appellant face to face at least three times.

At the hospital, appellant described the two men. He said that both were about 6' 4", one weighed about 200 lbs. and the other about 225 lbs. They wore floppy-brimmed hats, and one wore sunglasses. They were black and were between twenty and thirty years old. While this description was brief, its accuracy with regard to appellant was not challenged.

The testimony to which appellant refers, concerning the possibility of mistaken identification, is as follows:

"Q. Mr. Tornatta, you have told the jury here that in good faith you believe that Steven Clark is the #2 man, isn't that correct?
A. Yes, sir.
Q. You could be wrong, though, isn't that correct?
A. No, sir, I don't think I am.
Q. Didn't you make a statement back before that there's always a possibility?
A. Yes, sir, I did. When the question was asked—I forget whether you asked it or Attorney Flynn or whether it was Attorney Noffsinger—asked me the question, wasn't there a possibility of an error? Well, yes, there's always a possibility of an error, and that was the reply that I gave to the question, but there was no doubt in my mind.

Q. I understand that, but you could be mistaken, isn't that correct?

A. Could I be mistaken?

MR. MONTGOMERY: Yes, sir.

A. There's always a possibility.

MR. MONTGOMERY: I believe that's all.

RE-DIRECT EXAMINATION OF WILLIAM J. TORNATTA BY JAMES M. REDWINE, DEPUTY PROSECUTING ATTORNEY:

Q. Mr. Tornatta, is there any reasonable doubt in your mind that the defendant in this case robbed you?

MR. MONTGOMERY: Now, to which I'm going to object to that; that calls for a legal conclusion on the part of the prosecutor; that's for the jury to decide. The prosecutor used the term reasonable doubt.

BY THE COURT: You want to rephrase your question.

Q. Is there any doubt that the defendant is the man that robbed you on August 5th, 1973?

A. No, sir, there's no doubt.

Tornatta was wrong about the color of the men's faces and admitted that there was always the possibility of an error in identification. Although these matters do imbue his testimony with a very slight tinge of equivocation, it is not legally significant here. Tornatta had observed appellant at the time of the crime intermittently, over a thirty minute period and in a lighted area. He had accurately described appellant's weight and height immediately after the crime. From the witness stand, he identified appellant as one of his assailants. His testimony constituted evidence from which the jury might conclude beyond a reasonable doubt that appellant was present in the taxi and participated in the crime.

The second issue is whether the court erred in permitting the prosecuting attorney to cross-examine a defense witness concerning the recent conviction of her father, in order to show her bias against the State. The witness, Sandra Clark, provided appellant with an alibi. The alleged crime occurred at 2:00 a.m., August 5, 1973. At 7:00 or 8:00 in the evening of August 4th, appellant, who was engaged to Sandra Clark, returned to the house where they were living. She fixed

dinner, and they watched television, played records and went to bed. She testified quite clearly that appellant was at home all night long and could not have committed the alleged offense at 2:00 a.m.

During cross-examination of Sandra Clark, over appellant's objection, the State was permitted to put before the jury the fact that she knew that her father had been convicted of possession of an unlicensed pistol. The cross-examination appears in the following excerpt from the record:

"CROSS EXAM. OF SANDRA CLARK BY STATE CONT.:

Q. Who else lived at 806 John Street?

A. My father.

Q. What's your father's name?

A. Mr. Armegene Clark.

Q. Armegene Clark?

A. Yes.

Q. You're not too happy with the State of Indiana are you, Miss Clark?

A. Yes, I am.

Q. You're very happy with us, right?

A. Yes.

Q. You're very happy with the fact that your father was convicted —.

MR. MONTGOMERY: Oh, Judge, I'm going to object to this. He knows this is improper. Her father is not the subject of this case.

BY THE COURT: I believe you're cross-examining Sandra Clark, not anything having to do with her father.

MR. REDWINE: I'm attempting to show motive on her part to attempt to prejudice the State's case.

* * *

[At this point, the court had a hearing on the issue.]

RULING BY THE COURT:

BY THE COURT: The objection is overruled. Go ahead.

MR. REDWINE: Would you read back the question, please, Miss Reporter?

REPORTER: You're very happy with the fact that your father was convicted just last week in a Court in this county?

Q. What is your answer to that, Miss Clark?

A. I am happy with the State. I love the State of Indiana.

Q. What is your answer to my question concerning your father in the trial last week?

MR. MONTGOMERY: Show my continuing objection to these type questions.

BY THE COURT: All right.

Q. Were you aware of that trial?

A. Not until the 4th when I came here for this trial, which was postponed until today.

Q. Miss Clark, the charge against your father was filed June the 27th, 1973, are you telling this jury that you knew nothing about a charge against your father for six months?

A. I knew about the charge. You said the trial. You didn't say anything about the charge. Like I said, I knew he went to jail.

Q. And before you took the stand today, did you know the verdict?

A. Yes, yesterday I knew the verdict, which my sister told me was $500.00 fine."

In the trial court and on appeal, the State seeks to justify showing her father's conviction on the theory that it showed that the witness had a reason to be biased against the State and a motive to lie.

We find no cases dealing directly with the right of the State to use prior convictions for the purpose of showing bias and prejudice against the State. There are, of course, many cases which legitimate the use of certain convictions to show that the witness' moral character is such that he would be likely to lie. *Ashton* v. *Anderson*, (1972) 258 Ind. 51, 279 N.E.2d 210. Such cases do not apply here. However, courts are liberal in permitting counsel to demonstrate a witness' bias by presenting evidence of hostility against or in favor of either party. 3A Wigmore, *Evidence* § 944 (Chadbourn ed. 1970) ; 3 J.B. Weinstein, *Evidence* 607-17 (1975).

"The range of external circumstances from which proba-
ble bias may be inferred is infinite. Too much refinement
in analyzing their probable effect is out of place. Exact
concrete rules are almost impossible to formulate, and where
possible are usually undesirable. In general, these circum-
stances should have some clearly apparent force, as tested
by experience of human nature, or, as it is usually put,
they should not be too remote." Wigmore, *supra* § 949,
at 784.

Evidence of bias is not limited to the scope of direct examina-
tion, nor is such evidence collateral. *U.S.* v. *Baker*, (6th Cir.
1974) 494 F.2d 1262; *U.S.* v. *Blackwood*, (2d Cir. 1972) 456
F.2d 526, *cert. denied*, 409 U.S. 863; *U.S.* v. *Masino*, (2d Cir.
1960) 275 F.2d 129; *U.S.* v. *Lester*, (2d Cir. 1957) 248 F.2d
329; *Bewley* v. *State*, (1966) 247 Ind. 652, 220 N.E.2d 612;
McCormick, *Evidence* 81 (1972). In *United States* v. *Baker*,
*supra*, the court stated:

"The Government argues that a trial judge has a wide
discretion to limit an inquiry into a witness's bias and
motive to falsify, particularly where that evidence is col-
lateral. However, we cannot view as collateral the defend-
ant's attempt to discredit the inculpatory testimony of a sole
accusing witness by proof of bias or motive to falsify."
494 F.2d at 1266.

Courts permit some detail concerning the nature of a quarrel
for example, if the detail shows the degree of the resultant
hostility, and courts will permit the witness to ex-
plain that his hostility has diminished and why.
However, courts exclude evidence of fault or justi-
fication, which are irrelevant. Wigmore, *supra* §§ 951-952;
accord, *Riddle* v. *U.S.*, (5th Cir. 1922) 279 F. 216, *cert. denied*,
259 U.S. 586.

Arrests and indictments against the State's witnesses have
been admitted if the trial or sentencing was pending, and the
witness, therefore, had reason to curry the favor of the
prosecutor. *Gordon* v. *U.S.*, (1953) 344 U.S. 414, 73 S.Ct.
369, 97 L.Ed. 447; *Alford* v. *U.S.*, (1931) 282 U.S. 687, 51
S.Ct. 218, 75 L.Ed. 624; *U.S.* v. *Baker, supra; U.S.* v. *Black-
wood, supra; Hughes* v. *U.S.*, (9th Cir. 1970) 427 F.2d 66;

*U.S.* v. *Persico*, (2d Cir. 1962) 305 F.2d 534; *U.S.* v. *Masino, supra; Adler* v. *State,* (1967) 248 Ind. 193, 225 N.E.2d 171; Annot., 62 A.L.R.2d 610, 630-642 (1958). But, the State's proposal would permit this evidence to come in to show a reason for a defense witness' hostility to the State.

In *U.S.* v. *Williams,* (5th Cir. 1971) 446 F.2d 1115, the trial court had permitted the State to cross-examine the defendant's main witness by questions similar to those posed by the State in this case, in order to show the witness's bias against law enforcement personnel. The witness had testified that rocks thrown at Coast Guard officers had come from a direction other than that where the defendant was standing. The prosecutor then questioned the witness:

" 'Q. Have you ever been chased by the Coast Guard?
'A. Yes.
'Q. Have you ever had difficulties with the Coast Guard?
'A. Yes.
'Q. And does that in any way affect your ability to be completely impartial as far as the Coast Guard is concerned as to what they do? You don't like the Coast Guard, do you?
'A. I don't have anything against them. They chase everybody out there that drops nets.
'Q. And what have they done to you as a result of your being chased by them or having difficulties with them?
'A. I have gotten tickets before.
'Q. And have there been any results other than just tickets and fines?
'A. No.
'Q. How many times have you been stopped by the Coast Guard, sir?
'A. I don't know the exact number.
'Q. A lot?
'A. Not that much.
'Q. Well, they checked you for routine checks?
'A. Quite a few times.
'Q. You say you don't really have anything against the Coast Guard. You are not particularly fond of them, are you?

'A. They serve their purpose.
'Q. And how do you feel about law enforcement personnel in general?
'A. I don't have anything against them.
  'MR. PAPY: I think that is an improper question. It has nothing to do with this case.
  'THE COURT: Objection overruled.
'A. I don't have anything against law enforcement.
BY MR. MARTINEZ:
'Q. Have you had any personal contact with the law enforcement people that would let you have an opinion like this?
'A. Yes, I have.
'Q. And you have nothing against law enforcement people?
'A. No, I don't.
'Q. They always treated you courteously and very nicely?
'A. Yes." 446 F.2d at 1116.

On appeal, the court upheld the trial court's ruling on the impeaching cross-examination:

"Appellant cites the case law to the effect that proof of past convictions is admissible for impeachment only when they involve moral turpitude. But we think that rule is not in point here. Those cases deal with admissibility of past violations of the law, unconnected with the present case, to show the witness' disposition to lie. What is at issue in this case is the showing of the witness' own contact with the Coast Guard, which might have biased his view, just as his friendship with the defendant might have. This information is directly related to the witness' credibility." 446 F.2d at 1116-17.

And similarly, in *State* v. *Cooper*, (1946) 26 Wash.2d 405, 174 P.2d 545, the state cross-examined an alibi witness for the purpose of showing his hostility against the state, where the trial prosecutor had previously brought charges against him. On appeal, the court held that the trial court had acted within its discretion in permitting cross-examination on that point.

The relevance of a conviction to bias against the State remains an arguable point. On the one hand, it is easy to imagine that a prior conviction might produce an extreme and undifferentiated hostility against the State, causing a witness to exaggerate or slant his

testimony against the State. On the other, it is equally easy to conceive of a prior conviction which is so remote as to arouse no such animus at all. For example, if the challenged witness pled guilty to a minor offense and was minimally punished, in all likelihood, the witness' conviction would not produce a sense of hostility against the State sufficient to color his testimony. However, in order to legitimate a subject matter for cross-examination for bias, the questioning party does not have to show that such matter will necessarily prove the witness' bias and prejudice, but only that there exists a reasonable degree of probability that the witness is biased or prejudiced because of this evidence. We believe that such reasonable degree of probability did exist in this case.

After appellant's first objection to the State's question on this subject matter, the court removed the jury from the courtroom and conducted a brief hearing. This was the proper procedure. At the hearing, it was established that the conviction had in fact occurred. It had resulted from a jury trial the week before in the same court. Appellant's attorney had been the witness' father's court-appointed attorney. The father had been fined $500.00. The witness had not attended the trial. She and her father did not keep in touch, and, consequently, she had not known that there was to be a trial. The witness had agreed to be a witness for the defense in this trial before she learned of her father's trial and conviction.

Following this hearing, the trial court overruled the objection. Appellant presumed aloud that the court would not admonish the jury. He moved for a mistrial on this matter, which was overruled. The trial resumed, and, during the continued cross-examination of the witness, the judge permitted the jury to receive approximately the same information as he had heard during the hearing. At no point in the trial was appellant shown to have a connection with the father's crime or conviction, save that he was acquainted with the daughter.

In this case, therefore, there was little likelihood that the jury mistakenly considered the father's conviction as proof of appellant's criminal propensities or of guilt itself, thereby seriously threatening the fairness of the trial. Under the circumstances, the State could cross-examine the witness concerning the conviction of her father.

Appellant complains of five remarks which the prosecuting attorney made during the course of the trial. During voir dire examination, in apparent response to defense counsel's statement that he thought the defendant was innocent, the prosecutor stated that, based on the evidence to be presented, he believed the defendant was guilty. Inasmuch as the prosecutor's statement was restricted to the evidence and was not based upon implied personal knowledge, the statement was within the bounds of permissible advocacy. *U.S.* v. *Sawyer*, (4th Cir. 1965) 347 F.2d 372; *Henderson* v. *U.S.*, (6th Cir. 1955) 218 F.2d 14, *cert. denied* 349 U.S. 920; *Swope* v. *State*, (1975) 263 Ind. 148, 325 N.E.2d 193.

On cross-examination of a police officer, defense counsel asked, "You wouldn't like to go in a line-up either would you, officer?" The trial prosecutor objected, "Objection, Your Honor, Officer Wolf has never committed an armed robbery."

And, at another point in the trial, on re-direct examination, defense counsel asked his own witness whether he was telling the truth. The prosecutor objected, and bickering ensued between counsel, during which the prosecutor insinuated that defense witnesses were lying. These objections amounted to an insinuation of appellant's guilt. However, in the context in which they occurred, they were not coupled with any implication that the prosecutor had some knowledge superior to that of the jury upon which to rest this insinuation. Moreover, these objections were made during intense moments of the trial partially in response to remarks of defense counsel. Retaliatory responses of this sort are not to be encouraged. However, when kept within reasonable bounds, they are to be judicially tolerated if the

values of spirited advocacy are not to be lost altogether. *U.S.* v. *Socony Vacuum Oil Co.*, (1940) 310 U.S. 150, 60 S.Ct. 811, 853, 84 L.Ed. 1129; *Garrett* v. *State*, (1973) 157 Ind. App. 426, 300 N.E.2d 696.

During final argument, the prosecutor stated that the defendant was not a nice guy and was not a babe in the woods. Upon objection, the prosecutor withdrew the statement before the jury, apologized for it, and stated that what he had meant was that, based on the facts of August 5th, the appellant had pulled off a professional taxi robbery with precision. These statements of the prosecutor would have had little, if any, persuasive effect upon the jury. Any prejudicial effect of these statements would have been cured by the fact that counsel withdrew them. *U.S.* v. *Socony Vacuum Oil Co., supra.*

A brief explanation of events occurring at trial is necessary to an understanding of the fifth remark objected to by appellant. Gregory Smith, John Hawkins, Paul Womack and Hersity Stewart were arrested for an unrelated armed robbery. The defense called Stewart, who testified that he had not participated in the robbery of cab driver Tornatta and that he had not admitted doing so at any time. The defense then called Smith and Hawkins, who stated that Stewart had told them that he and another man had robbed a cab driver at about the same time and place as the Tornatta robbery. The State responded by calling a police officer who testified that Smith and Hawkins were angry at Stewart, because they believed he had informed against them in their case. The State also recalled Mr. Tornatta who testified that Stewart had not robbed him.

The prosecutor, in his final argument, over objection of defense counsel, commented upon the attempt by the defense to create a doubt in the minds of the jurors by the use of the witnesses Stewart, Smith and Hawkins. He stated:

"I would like for you to consider the witnesses the defendant has used, and I'd like for you to carefully consider what it means, *not only in this case but in future cases,*

if they accomplish what they've set out to do. . . . Now, ladies and gentlemen, if you buy that theory, this is what will happen: When John Hawkins is tried and when Greg Smith is tried . . . what's to prevent him from doing the same thing with John Hawkins and Greg Smith? It's very easy when you're charged with a crime to say somebody else did it; very easy to say somebody else told me they did it because that helps get you off; *but more importantly for the history of this county and the future, this would set a precedent.* When a man was charged with a crime, if he could get other men to come in and say somebody else told him they did it because they're mad at the other man, *that would be the end of criminal convictions.* Carefully consider the evidence in this case, a very important case. The defense theory in this case, if accepted, *will set a precedent.*" (Emphasis added.)

The main import of these statements is unrelated to any issue in this case. The prosecutor asked the jury to disregard the testimony of Smith and Hawkins in order not to impede prosecutorial efforts in future criminal cases. He asked the jury to disregard this testimony as a matter of civic duty, at a time in history when most people fear the high incidence of crime. The implication that this jury's refusal to disregard the evidence would bind future juries in criminal cases is, as a legal matter, false and misleading. The prosecutor's statements were highly improper, and the trial court should have sustained the objection and instructed the jury to disregard them. *Viereck* v. *U.S.,* (1943) 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734; *U.S.* v. *Socony Vacuum Oil Co., supra.* However, under the circumstances of this case, we do not deem these remarks to have influenced the jury's decision. The improper remarks of the prosecutor were directed solely toward the jury's consideration of the testimony of Smith and Hawkins that Stewart had admitted participating in the robbery. Stewart himself denied the statement from the witness stand, and the victim was sure that Stewart was innocent. The evidence of Smith and Hawkins was remote and marginal in its impact. The main defense was the alibi which the witness Sandra Clark set out in her testimony. The prosecutor did not ask the jury to disregard her alibi testimony. Even if

the jury believed that Stewart had admitted the crime to his associates, such belief would not likely have affected the acceptance by the jury of the alibi testimony. The prosecutor did not ask the jury to convict on the case as a whole as a matter of civic duty.

The conviction is affirmed.

Givan, C.J., Arterburn, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 348 N.E.2d 27.